STARKEY CONSTRUCTION, INC. AND
MARYLAND CASUALTY CO. *v.* ELCON, INC.,
FIRST NATIONAL BANK IN LITTLE ROCK ,FIRST STATE
BANK AND TRUST CO., OF CONWAY, AND
GRAYBAR ELECTRIC CO., INC.

5-5199                                              457 S. W. 2d 509

Opinion delivered June 15, 1970

[Rehearing denied September 21, 1970.]

*Jones & Stratton,* and *Patten & Brown,* for appellants and cross-appellees.

*Smith, Williams, Friday & Bowen,* for appellees and cross-appellants.

CARLETON HARRIS, Chief Justice. Starkey Construction, Inc., one of the appellants herein, hereafter called Starkey, was low bidder as general contractor for two Arkansas Power and Light Company projects, one a service center in Arkadelphia and one an office building in Conway. Maryland Casualty Company, Starkey's bondsman, is the other appellant. Elcon, Inc., was given a subcontract on both jobs, being required to furnish labor, electrical, and mechanical materials for the Arkadelphia job, and to furnish electrical and labor for the Conway project. The subcontract for Arkadelphia was let on October 10, 1967, for $79,882.00, plus $114.25 later added; on November 7, 1967, the Conway subcontract for $38,912 was let. Elcon was unable to acquire a payment and performance bond for either contract, having reached its bonding limit on other jobs.

Elcon purchased materials from various companies, and furnished labor for the two jobs, and these materials and labor were to be paid by Elcon, which received periodic progress payments as required by the contract. Each progress payment was computed to pay for 90% of the "completed work and materials stored on site" as of the 25th of each month. The first progress payment on the Arkadelphia job was received on December 5, and thereafter progress payments were made at approximate intervals of thirty days until June 26, 1968, such payments totalling $96,748.89. All Starkey checks except one for $1,661.00, were joint payee checks i. e., the checks were made out to Elcon and some of the suppliers, some of the checks including as many

as six payees, and the rest in varying numbers. Starkey's bank was the First State Bank and Trust Company in Conway, and Elcon's bank was the First National Bank in Little Rock. When the joint payee checks were presented and honored against Starkey's account in the First State Bank, all bore one or more forged endorsements. Relative to the Arkadelphia job, $70,339.25 in Starkey checks bore unauthorized or forged endorsements, and $22,994.00 of total progress payments totalling $26,305.00 on the Conway job bore forged endorsements. When the various progress payments were received by Jerry Lee, General Manager of Elcon at the time of the execution of the contracts, (subsequently elected president in February 1968), he endorsed one or more of the suppliers' names to the checks before taking them to the First National Bank. However, each supplier except Graybar Electric Company was paid the amount due by Elcon. The bank had previously made loans to Elcon for job operating expenses, and had secured said loans by assignment of invoices -in most instances. When the progress payment checks were presented at the bank and cashed, Lee would apply part of the proceeds to the indebtedness due the bank by his company. The records reflect that after some of the loans were satisfied in full, additional loans would be made, and these were handled in the same manner. The final check given by Starkey which is involved in this litigation, was a progress payment made on the Conway job and was in the amount of $6,287.00, said check being dated June 26, 1968. This instrument likewise bore a forged signature, that of Mike Matula, and when it was presented to First National, was applied by the latter to indebtedness due it by Elcon. Starkey, who had just found out about the forgeries on the progress payment checks, learning that Matula's name had also been forged, notified his bank, First State Bank and Trust Company of Conway, that he was stopping payment on this check. Following this event, Elcon ceased operations, and the completion of the job was taken over by Starkey (as of July 1, 1968), appellant expending $38,948.60 to complete the Elcon contracts. Of this amount, Starkey

would have owed Elcon $22,000 if the latter had completed the job; accordingly Starkey spent $16,948.60 of its own money in the completion.

In November, 1968, after notice of an intent to file liens on Arkansas - Power & Light Company properties by Graybar, Starkey instituted suit in the Faulkner County Chancery Court naming Elcon, both banks, and all known possible unpaid labor and material suppliers of Elcon, seeking an accounting and adjudication of rights between all parties.

Consent judgments were entered for all materialmen except Loren Cook Co.[1] and Graybar, and these judgments were satisfied by Starkey. After the filing of numerous pleadings, the court heard evidence on behalf of all parties, and entered its decree on June 4, 1969, findings pertinent to the appeal now before us, being as follows;

"It is, therefore, considered, ordered and decreed that: (1) That the the pleadings are amended to conform to the proof. (2) Graybar Electric Company have judgment against Starkey Construction, Inc., and Maryland Casualty Company in the sum of $19,648.17 together with interest thereon at 6% per annum from August 1, 1968 until paid: (3) Starkey Construction Company have judgment against the First State Bank in Conway in the amount of $7,244.18: (4) that First State Bank, Conway, have judgment against the First National Bank in Little Rock for $7,244.18: that the First National Bank in Little Rock have judgment against Starkey Construction, Inc. in the amount of $5,428.52: (6) all other claims among Starkey Construction, Graybar, First State Bank and First National are dismissed: (7) That Starkey Construction, Inc. have judgment against Elcon, Inc. in the amount of $23,827.40, and upon payment by Starkey Construction, Inc. or Maryland Casualty Co. of the judgment awarded Graybar Electric Company herein, jurisdiction is retained for judgment over against Elcon, Inc. for the sums paid:"

---

[1]After the trial was over, the Cook judgment was likewise satisfied.

Each of the judgments bore interest at the rate of 6% per annum from the date of decree and the court ordered that costs be borne equally by Graybar, Starkey and First National Bank. From the decree so entered, appellants bring this appeal. The two banks have cross-appealed from the judgments entered against them respectively. For reversal, appellants assert four points, as follows:

## I

The Court erred in not awarding Starkey judgment against First State Bank for $93,337.89.

## II

Alternatively, the court erred in not declaring First National Bank to be constructive trustee for $31,604.29 for payment of materialmen.

## III

The court erred in awarding Graybar Electric Company judgment for $19,648.17 against Appellants.

## IV

The court erred in holding First National Bank to be a holder in due course of the June 26, 1968, check of $6,287.00.

The cross-appeal relates to point three, the banks contending the Court erred in awarding Starkey a judgment against them for $6,814.41, this judgment being based upon checks wherein Graybar was a payee. We proceed to a discussion of each point.

## I

This contention is based upon the provisions of Ark. Stat. Ann. 85-3-419 Addendum). Subsection 1(c) provides that an instrument is converted when it is paid on a forged endorsement. Subsection (2) provides that

in an action against a drawee, the measure of the drawee's liability is the face amount of the instrument. Appellants point out the comment on these two subsections, as follows:

"3. Subsection (1) (c) is new. It adopts the prevailing view of decisions holding that payment on a forged indorsement is not an acceptance, but that even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion.

"4. Subsection (2) is new. It adopts the rule generally applied to the conversion of negotiable instruments, that the obligation of any party on the instrument is presumed, in the sense that the term is defined in this Act (Section 1-201), to be worth its face value. Evidence is admissible to show that for any reason such as insolvency or the existence of a defense the obligation is in fact worth less, or even that it is without value. In the case of the drawee, however, the presumption is replaced by a rule of absolute liability."[2]

It is thus appellants' argument that the forged endorsements of one or more payees upon Starkey's checks (totaling $93,337.89) destroyed their negotiability,

---

[2]Counsel for the banks give their version of the intent of Sec. 85-3-419, as follows:

"The drafters of the Code were addressing themselves to the problem of the value to be placed on a converted instrument, in view of the fact that many instruments are worthless because of the inability of the obligor to make the instrument good even if it had not been converted. Because of the difficulty in establishing that an obligor would have been able to pay had the instrument not been lost, the Code wisely provides that the instrument is 'presumed' to be worth its face value. Evidence may be introduced, however, to show otherwise. (Ark. Stats. § 85-1-201) In the case of conversion by a drawee (payment on an unauthorized endorsement) the measure of the drawee's liability is stated to be the face amount of the instrument. Certainly a bank should not be able to argue that the instrument was worthless when it has charged the customer's account the full face value of the check. Without the Code, the point would have been obvious. It was so obvious that the Uniform Negotiable Instruments Law did not even deal with the point."

and the drawee-payor bank wrongfully debited Starkey's account. We find no merit in this contention, for it is agreed that *all of the suppliers whose names were forged on the checks, except Graybar, were paid the money due them from the proceeds of each progress payment, notwithstanding the fact that they did not themselves endorse the checks.*

Lee testified that he endorsed the names of various payees only in order to expedite the cashing of the checks; for instance, on checks in excess of $500.00, where Graybar was a payee, it would have been necessary to obtain the endorsement from the St. Louis office.

We cannot believe that it was the intent of the General Assembly to hold a drawee (the bank) liable where the money actually reached the parties intended by the drawer of the check.

The Chancery holding which denied Starkey recovery against the bank to the extent the money actually reached the payees appears to be the general rule in this country, and is so stated in 10 Am. Jur. 2d, *Banks* § 625, as follows:

It is generally held that a drawer will be precluded from recovering from the drawee bank for paying his check on a forged endorsement where, *notwithstanding the forgery, the proceeds of the check actually reached the person whom the drawer intended to receive them."* (Our emphasis)

The same statement appears in 9 C. J. S. *Banks and Banking,* Sec. 356 (c):

"Generally a bank is liable to the drawer of a check for paying it on a forged indorsement, in the absence of estoppel, contributory negligence, or ratification, or *unless the money has reached the intended person."* (Our emphasis)

We find no reference in the statute heretofore

mentioned to the situation presented in the instant case, *i. e.,* where the money actually reached the party intended by the drawer.

Of course, as pointed out by appellees, in attempting to codify a large body of law it is almost impossible to anticipate all the factual situations that may arise. And it is for this reason that courts have adopted the principle. of statutory construction that a statute will not be construed so as to overrule a principle of established common law, unless it is made plain by the act that such a change in the established law is intended. In *Barrentine and Ives* v. *State,* 194 Ark. 501, 108 S. W. 2d 784, we said,

"It has long been the rule in this state that 'A statute will not be taken in derogation of the common law unless the act itself shows such to have been the intention and object of the legislature.' (citing cases). A careful reading of the act fails to convince that such was the intention and object of the Legislature."

We also agree that the unauthorized endorsements were ratified by the persons or companies whose names had been forged when the payees accepted payments due them from the proceeds of the checks, Section 85-3-404 Ark. Stat. Ann. (1961 Addendum) provides that any unauthorized signature is wholly inoperative as that of the person whose name is signed unless that person ratifies it or is precluded from denying it.[3] Of course, Starkey, contending that it is somewhat in the position of a subrogee of the payees whose names were forged, cannot possibly be in any better position than the payees of the check.

Since they unquestionably ratified the signatures by retaining the benefits of the transaction, Starkey is likewise in the same position. Appellants say that the issue of ratification was not raised in the pleadings

---

[3]Such a ratification does not of itself affect any rights of the person ratifying against the actual signer.

filed by the banks; however, the initial finding of the Court in its decree was that the pleadings were amended to conform to the proof. We reiterate that the contention is without merit.

## II

We likewise disagree that this contention contains merit. Starkey, of course, could have refused to make the progress payments to Elcon if Starkey found that materialmen were not receiving their money. This appellant was due, under its contract with Arkansas Power & Light, to first ascertain that Elcon was entitled to each progress payment before same was made. Certainly, there was a duty on Starkey to check each application for progess payments, and Truman Starkey, President and General Manager of the construction Company testified that his brother would call the job superintendent and verify the percentages completed for the month; he would then obtain the approval of the architect that Elcon was entitled to an advance for supplies and labor under the contract, and would make the progress payment. He said that he called the material suppliers, and called Graybar nearly every month, talking with F. C. Lanigan, financial manager of the Graybar Electrical Company, to determine how much Elcon owed Graybar, and if the account was being paid satisfactorily. The witness stated that Lanigan would answer "O.K.", and Starkey did not know otherwise until June 28, at which time he was told by Lanigan that the latter had not received any checks issued by Starkey. Appellant then learned that Lee was forging the names of payees.

Starkey testified, that as far as he knew, the First National Bank had no better information than the contractor relative to whether Elcon was paying its bills, and he said that he did not request Fikes( Robert Fikes, Assistant Vice-President and a loan officer of the bank) or anyone else at the bank to go and examine the books on each of the payees to determine if the latter had received their money before the bank accepted one

of the checks. The witness stated that he was aware of the fact that the bank was lending money to Elcon, and if the signatures had been good, and the suppliers had been paid, it would have been all right for First National to apply proceeds from the checks to payment of loans it had made to Elcon.

As previously stated, Starkey was obligated under its contract with the power company to determine that all bills, labor, and material, going into the job, were paid before -each progress payment was applied for by Starkey. It was in compliance with this duty that Starkey made the investigation, heretofore mentioned, to determine if Elcon's suppliers were being paid. In addition- to a job superintendent and architect to help in making his determination, Starkey also had the name of every supplier which had been furnished to it by Elcon. Starkey did not do what it is now contending the First National Bank should have done i. e., require the suppliers to furnish the company with paid invoices for the materials known to have been placed on the site of the job each month. On the other hand, First National had no contractual duty to conduct such an investigation of Elcon to determine that all labor and material bills were being paid; in fact, it was not even aware of the names of all of these suppliers. It had no job superintendent or architect at its disposal, and the testimony reflected that it is not customary in the banking business to make a check on each contractor who desires to cash progress checks at the bank to first ascertain if he has paid all labor and material bills. In fact, Starkey testified that he had no reason to believe that even if First National had conducted such an investigation, it would have gotten any -different answer from the suppliers than was given Starkey. Also, should not Starkey's knowledge that Elcon was unable to furnish payment and performance bonds for the two jobs have made him particularly careful to see that Elcon's suppliers had been paid?

It would seem that under the circumstances, the bank was entitled to rely upon the determination al-

ready made by Starkey that Elcon's bills were being paid as contemplated; actually, it would appear that Starkey is now in the position of contending that the First National Bank is liable to Starkey for its mistakes. We think the evidence is rather clear that, even if the names of payees had not been forged, Starkey still would be in the same position, for its troubles stem from the fact that it did not make-sure that suppliers were being paid before issuing new progress payment checks. It must also be remembered that the loans made by the bank to Elcon were for "operating capital", i. e., the proceeds of these loans were to be used for the payment of labor, materials, and various overhead expenses for completion on this job as well as others,[4] and progress payments were designed to cover overhead and profit as well as cost of materials and labor. In other words, the first monies received by Elcon to be applied to the costs of the Starkey job came from the bank.

## III

This point pertains to the Arkadelphia job only, since Graybar was not listed as a payee on any of the checks given on the Conway job. The trial court found that, using the 25th of the month as cut-off date for each estimate, the amount of Graybar's billings to Elcon which were included in all of the checks (Arkadelphia job) amounted to $14,697.21

After proper credits for three payments no longer involved in this litigation, the Court held that Graybar was due to receive $6,818.41 because of progress payments made, wherein Graybar was a payee, but where it did not receive its money, its name being forged by

---

[4]Some of the funds which were used by Elcon to repay First National Bank loans were monies received from other jobs. It is interesting to note that total deposits made during the period December 1, 1967, to July 1, 1968, to the Elcon account were $180,729.82, and of this amount, only $96,748.89 was deposited from Starkey funds; the balance of $83,980.93 came from other sources, $42,000 of this last amount being deposited in the account by First National Bank.

Elcon.[5] This amount was included in Graybar's judgment against Starkey, and Starkey was given judgment for said sum against First State Bank of Conway; First State Bank was in turn given judgment for the amount against First National Bank of Little Rock. The basis of judgment was, of course, the fact that Graybar's endorsement had been forged.

We agree that if Graybar had been deprived of its money because of the forgery, this appellee would be entitled to the judgment, but we think, and find, that the preponderence of the evidence reflects that the forging of its name on the progress payment checks had nothing to do with Graybar's failure to be paid monthly. To the contrary, it appears that Mr. Lanigan of Graybar voluntarily extended credit to Elcon with full knowledge of the progress payment checks that were being issued to Elcon by Starkey.

Jerry Lee testified that he had done business with Graybar since 1961 or 1962, and he further stated that he had always followed the practice of endorsing Graybar's name on any check in which that company was a payee. He said that Mr. Lanigan knew that this practice was being followed, and the reason for not getting the company to endorse the check was that the Graybar checks had to be sent to St. Louis for endorsement; this would require a week or ten days before a check could be endorsed and returned, and Lee said that he just could not wait that length of time to receive his own money from a check. The witness testified that Lanigan told him that he could not give any authorization to sign the checks, but that what Lee did with the checks was his own business. The Elcon president said that he had endorsed such checks in Lanigan's presence (on other occasions) more than once. Lee also testified that Lanigan would permit him to pay Graybar less than the amount due under a particular check, provided that the Elcon arrearage did

---

[5]The total judgment for Graybar against Starkey and Maryland Casualty was in the amount of $19,648.17, $11,199.51 being admittedly due for materials furnished on the Conway job, and $8,448.56 on the Arkadelphia job.

not exceed $5,000.00 for over ninety days. He said that Lanigan knew within a few days each time that Elcon received a check; that the two had conversations almost weekly, and that the crux of the matter was that his account had to be kept within the $5,000.00 within a ninety day period.

Lanigan denied that he knew any progress payments were being made to Elcon until April 12, when Lee came to his office with a check made payable to Elcon, Graybar, and three other suppliers. Lanigan said that Lee asked him to endorse that check since the latter had to have it to meet his payroll that day, but the witness testified that he told Lee that he (Lanigan) had no authority to endorse the check. He said that it was not unusual to carry job accounts and progress payments for from 60 to, at times, 120 days, and that the Elcon account was always in that category because of a lack of working capital, but toward the end of a job, Elcon would catch up, since it would receive its 10% retainage at that time. He said that he had made no inquiry of Starkey to see if progress payments had been made. After first denying any knowledge that Lee had, on some previous occasions, endorsed Graybar's name to a check, the witness admitted that about four years previously, this had happened, but Lanigan said he did not quarrel about the matter after Lee made the check good. Lanigan also agreed that it was unusual for a job to have been in progress since October without progress payments being made. He concurred with the testimony of Lee that Graybar policy required a separate report to New York if an account totaled over $5,000.00 for more than 90 days.

"We have to make a separate report to New York, and up to that time I decided if I could get that and get out from making this extra report, it was just a lot of work and get that down, that was the main reason we arrived at these figures."

Lanigan said that he had the authority without consulting anyone else to make the decision whether to accept payments on an account rather than payment

in full. Graybar's answer to the testimony of Lee is principally that the latter is an "admitted forger", but irrespective of that fact, we think the evidence substantiates the contentions of the two bank appellees.

What are the facts which support this contention? Graybar opened a separate account for the Arkadelphia job on October 23, 1967, and the first charge was made to Elcon on that date. On October 25, *before any progress payments had been made,* Lanigan wrote Starkey Construction that his company was handling the electrical materials on the Arkansas Power & Light building at Arkadelphia for Elcon, stating "we would appreciate it if you make the checks co-payable to Graybar & Elcon covering the material as billed. Thank you,"[6] It is thus apparent that Lanigan knew the job was under way, and it will be noted that he did not request a check upon completion of the job, but rather upon material "as billed". Of course, the purpose of a request to be included in the progress payment checks is to assure the supplier that it will be paid for its supplies furnished on the job as the job progresses.

Counsel for the banks- correctly list the dates of the progress payment checks and the status of Elcon's account with Graybar on the- corresponding dates. Seven progress payment checks were issued by Starkey on the Arkadelphia job including Graybar as a payee, beginning in December, 1967, and continuing -monthly thereafter through June, 1968. The first check was issued on December 5, 1967, for the November estimate, and was in the amount of $3,895.00; payees were Elcon, Plumbers Supply, and Graybar Electric. The Elcon account with Graybar, as of the monthly cut-off (25th of the preceding month) was $106.04. Graybar neither requested nor received money from this check, nor did it advise Starkey or First National that it had not received its money or that it had not endorsed the check. The second progress payment check,

---

[6]A similar letter was sent to Starkey by Lanigan on November 13, with reference to the Conway job.

for the December estimate, was issued on January 12, 1968, in the amount of $16,478.00. Again, Elcon, Plumbers Supply, and Graybar Electric, were listed as payees. Graybar neither requested nor received any amount from this check, and again, did not advise Starkey or the bank that it had not received its money, or that its signature had not been placed on the check. The third progress payment check, for the January estimate, was issued on February 12, 1968, in the amount of $4,633.00. Again, the same three payees were listed. At that time, the Graybar account, as of the cut-off date, was $3,005.35. Here, it will be observed that the account is more than ninety days old; however, it is not greater than $5,000. Graybar did not request, nor did it receive, any amount from this check. Again, Starkey or the bank was not advised that Graybar had not received its money and had not endorsed this check. The fourth progress payment check, for the February estimate, was issued on March 11, 1968, in the amount of $8,866.12. Payees were the same three previously listed, together with Barber-Coleman. The amount of the account had now risen to $5,810.14, and $106.04 was more than ninety days old. At this point it becomes necessary to discuss other testimony that was offered.

Lanigan admitted that at the time he called Starkey on June 28, after all progress checks had been issued, he had denied seeing any progress payment checks. However, the witness admitted that he had seen the April 12 check, hereafter discussed, although he did not examine it, and subsequently he admitted that J. C. Burton, estimator for Elcon during March, 1968, came to his office with the Starkey March check asking that Lanigan endorse it. He said he really didn't remember seeing the check, but that if Burton testified to the contrary, the witness wouldn't deny it. Burton testified that Lanigan refused to endorse it, but commented, "He told me that Jerry knew how to handle the check". Lee testitfied that he discussed the matter with Lanigan, and was told by the latter that he needed $596.65 to apply to Elcon accounts; that on March 15, a check in that amount was issued by Elcon to Gray-

bar and cashed by that company. Lanigan denied knowing of this check. This payment, according- to Lee, eliminated that portion of the account that was more than ninety days old.[7] The April progress payment check was $18,905.88, and from this amount, Graybar received a total of $7,530.31;[8] However, Graybar was only entitled to $408.15 for supplies furnished on the Arkadelphia job during the previous 30 days. The banks argue that Graybar was only entitled to this amount, rather than $5,810.14. In other words, the argument is that $7,122.16 should have been credited forward to apply to subsequent billings rather than permitting this amount to apply to previous billings, Graybar having had the opportunity to receive that total amount in previous progress payments, but refusing it without notifying Starkey.

Concluding this point, we are of the opinion that a look at Graybar's conduct during the seven month period of this job (along with the testimonies of Starkey and Lee), establishes that it would -be inequitable to permit Graybar to, in effect, go back and collect each successive progress payment check at the expense of First State and. First National for the reason that the forgery of Graybar's name *was not the cause of Graybar's failure to receive its money from the progress payment checks;* rather, the cause was the conduct of Graybar in improvidently carrying Elcon's account. Likewise, Graybar's judgment against Starkey cannot stand in the present amount. Starkey complied with Graybar's request by including its name in progress payment checks. Not once in the period of December 5, 1967, to June 26, 1968, did Lanigan advise Starkey that it was not taking its money. We think this conduct operates as an estoppel, and Graybar should not be

---

[7]The reason for the payment of this particular amount is not at all clear in the record. Whether this included some materials sold subsequent to February 25, or whether the check constituted partial payment on some account other than the Arkadelphia job, is difficult of determination.

[8]This included $1,720.17, which Graybar credited to another Elcon job, but the court held that this amount should be credited to the Elcon Arkadelphia job.

permitted to recover any amount which it had the opportunity to receive from progress payments.

In *Degen* v. *Acme Brick Co.*, 228 Ark. 1054, 312 S. W. 2d, 194, a case bearing some similarity to the one at bar, we said:

"The parties recognize the fact that a materialman may estop himself from asserting the lien that would otherwise be available to him. (citing case) * * *"

"Without enumerating the familiar elements of estoppel, we think it enough to observe that the appellants' proof satisfies every requirement. The Brick company represented to Degen that it would collect the money as the title was delivered and gave receipts indicating that this practice was being followed. Although the company's manager had stated in effect that no credit would be extended to Bell, the unreasonable delay in the depositing of the contractor's checks was equivalent to an extension of credit. If the checks of early September had been presented promptly and found to be worthless, it would evidently have been the company's duty to notify Degen, which could and should have been done long before he settled his account with Bell in October."

This holding is in accord with the general rule stated in 57 C. J. S. Mechanics' Liens, Section 229, p. 803, as follows:

"As a general rule a person entitled to a mechanic's lien may be estopped to assert or enforce it in equity by any act which will render it inequitable for him to do so."

### IV

We agree with the trial court in its holding that Starkey was not entitled to stop payment on the June 26, 1968, check of $6,287.00. It will be remembered that the bank had given value for the check without knowing of any defense available to Starkey. Appellant's

argument is based on the fact that the name of Mike Matula had been forged and, says appellant, the forged signature destroyed the negotiability of the check. We have already somewhat discussed this issue under Point I.

We agree that that is generally true, but the name of Mike Matula had been placed on this check through mistake, and the record clearly reflects, in fact, almost without contradiction, that Matula was not due any money at that time from the Arkadelphia job. As stated in 11 Am. Jur. 2d, Section 321:

"The rule that indorsement of all joint payees is essential to negotiation has been held inapplicable in regard to a joint payee whose name had been mistakenly inserted or left on the paper, or to one who refused to be a payee to it and who was treated by the drawer or promisor and other parties, both in the delivery of the instrument and in its transfer or negotiation, as no party and as having no interest in it. Accordingly, it has been held that real payees can transfer the ownership of an instrument without obtaining the indorsement of a payee whose name is thus upon the paper."

Of course the actual reason why Starkey stopped payment on the check was that he had just learned that Elcon had not been paying its material bills and that the check should not have been issued, and we agree with the position taken by the banks that - the unauthorized endorsement had nothing to do with stopping payment on the check, and appellant cannot be permitted to take advantage of the immaterial unauthorized endorsement to the detriment of the bank, which had purchased the instrument in good faith.

Summarizing, we affirm the trial courts decree as to points I, II, and IV. As to point III, our holding has been fully stated. Starkey's judgment against First State Bank and its judgment against First National Bank, are hereby reversed, set aside, and held for naught. However, it is difficult to ascertain from the

briefs the exact amount that Graybar's judgment against Starkey should be reduced. Certainly, it should be reduced by as much as the amount of the judgment Starkey had obtained against the banks, *i. e.*, $6,818.41, and it would appear that this is the proper amount; however, the figures are quite confusing and it is felt that the case should be remanded to the Chancery Court for the purpose- of properly determining this amount, *i. e.*, the sole question on remand accordingly is, "What amount of money did Graybar have the- opportunity to receive but did not accept- (or demand payment) from progress payment checks issued by Starkey, and bearing the name of Graybar at its request?"

Affirmed in part; reversed in part and remanded.

It is so ordered.

Brown, J., concurs.

Fogleman, J., dissents in part;

John A. Fogleman, Justice, dissenting in part. I must dissent in part, because I feel that the decision as to the liability of First State Bank to Starkey Construction, Inc. (hereinafter referred to as- Starkey), and consequently that of First National Bank to First State Bank, is contrary to the provisions of the UCC. Although the majority recite the applicable provisions at length, along with appropriate committee comments, it seems to me that the opinion then seeks to justify by-passing the governing section by resort to decisions predating the code. I recognize that pre-existing principles of law and equity are to *supplement* the code, *where they are not displaced by its particular provisions.* Ark. -Stat. Ann. § 85-1-103 (Add. 1961). We must always, however, keep in mind that basic purposes of the code were to simplify, clarify and modernize the law governing commercial practices, and to make uniform the law among the various jurisdictions. § 85-1-102. When we resort to precode law to circumvent

an effect of the code that may seem harsh at first blush, we tend to subvert its salutary purposes.

As I read the UCC, I find that the first point of appellant Starkey has merit. Under Ark. Stat. Ann. § 85-3-419(1)(c) (Add. 1961) the forged checks were converted by First State Bank. First State Bank's liability is set out in subsection (2) of that section, i. e., "The measure of the drawee's liability is the face amount of the instrument." Comment 4 to § 85-3-419 provides as follows: "In the case of the drawee, however, the presumption[1] is replaced by a rule of absolute liability." First State Bank was not entitled to urge as a defense that the various joint payees had received the proceeds of the forged instruments; hence, Starkey should have been awarded judgment against First State Bank for $93,337.89, the sum of the face amounts of the forged instruments. First State Bank should have been awarded judgment against First National Bank in the same amount under First National's guarantee of endorsements.

It is not controverted that there was a general assignment of Elcon's rights under the contract by Elcon to First National. The question then arises whether First National could enforce Elcon's rights under the contract, having been forced to assume its liability. First National could enforce Elcon's rights under the contract and would be entitled to judgment against Starkey as to those checks which bore forged endorsements but were ratified by the payees whose endorsements were forged. The unauthorized endorse-

[1](Footnote mine.)

The committee here speaks of the presumption, as to other parties, that the measure of liability is presumed to be the face amount of the instrument. It adds that as to all *except the drawee* evidence is admissible to show that the instrument is worth less, or is without value. The idea that this section is intended to replace existing law is clearly expressed by the committee's designation of the pertinent subsection as new, indicating a change from the provisions of the Uniform Negotiable Instrument Law. The purpose of the drafters to put the burden of forged endorsements on the bank and to eliminate the necessity for the drawer of a check to make just such proof as required by the majority opinion seems to me to be beyond doubt.

ments were ratified by persons or companies whose names had been forged whenever these payees accepted payments due them from the proceeds of the checks. For purposes of this action, under Ark. Stat. Ann. § 85-3-404 (Add. 1961) and Comments, the endorsements would be treated as valid and the instruments enforceable. To the extent that Elcon did not perform the contract or to the extent that the forged endorsements were not ratified, First National would not be entitled to recover since its rights as assignee are subject to the terms of the contract between Elcon and Starkey. Ark. Stat. Ann. § 85-9-318(1)(a) (Add. 1961). The effect of a recovery by Graybar or other payees against Starkey for unpaid proceeds would be to reduce any recovery by First National Bank.

Starkey actually recognizes First National Bank's rights in this regard by stating in its brief that this bank would be entitled to whatever amount remained out of the $93,337.89, after Starkey's payment of Elcon's unpaid material bills, the cost of completion of the job and the claim of Graybar. They calculate this amount at $76,767.31, less any judgment in favor of Graybar.

Of course, if all of the suppliers named as payees had been paid, and there was no recoverable loss to Starkey by reason of Elcon's default, First National would probably be entitled to the face amount of the checks, which would offset any recovery by Starkey.

I would reverse the decree on Point I.