**G & R CORPORATION, a Delaware Corporation, et al.**

v.

**AMERICAN SECURITY & TRUST COMPANY, Appellant,**

**Max S. Kraft and Oscar Margulies.**

**No. 74–1720.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 22, 1975.

Decided Nov. 28, 1975.

Francis M. Shea, Washington, D. C., with whom John Townsend Rich, Washington, D. C., was on the brief for appellant.

Michael Evan Jaffe, Washington, D. C., with whom Burton A. Schwalb, Washington, D. C., was on the brief for appellees.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

TAMM, Circuit Judge:

Plaintiff-appellee brought this action in the District Court for the District of Columbia to recover funds diverted by appellant from a joint venture account. Federal District Judge Howard F. Corcoran found that appellant had wrongfully applied the funds and entered judgment for appellee in the amount of $132,605.19 plus interest. On appeal, appellant argued that appellee had ratified any unauthorized diversion, that the District of Columbia Uniform Commercial Code (hereinafter U.C.C.) barred suit for certain of the monies, and that the trial court had improperly computed damages by failing to set off against the diverted sums the amount appellee had realized from tax savings and subsequent appreciation of property received by appellee from the third-party defendants. We have evaluated these claims and found them without merit; we therefore affirm the judgment of Judge Corcoran.

## I. Factual Background

This case arose out of disbursements of mutual venture funds for the payment of non-joint venture obligations. On October 5, 1964, Mr. and Mrs. Morris Rodman (sole owners of G & R Corporation) and Mr. and Mrs. Leonard Rodman entered into an agreement with Max Kraft and Oscar Margulies to construct Gateway Square, an apartment complex. The Rodmans were to contribute the land for the project; Kraft and Margulies were to serve as general contractors. The Rodmans, Kraft, and Margulies were at that time collaborating in the construction of another apartment project known as Gateway Gardens.

In order to finance Gateway Square, the Rodmans, Kraft, and Margulies obtained a construction loan in the amount of $2,500,000 from appellant bank American Security Savings & Trust Co. (hereinafter American Security). The loan agreement, which specified a completion date of March, 1967, provided that advances made under the loan were to be received in trust for the joint venture and that American Security had no obligation to assure the proper use of the Advances. J.A. at 52, ¶ 6. The agreement also gave American Security the right to take possession of the project in order to complete construction if the builders breached the loan agreement, *id.* at 53-54, ¶ 9, and to request evidence of proper application of advance proceeds before making further advances, *id.* at 60, ¶21.

The Rodmans, Kraft, and Margulies also executed a Guaranty Agreement to American Security at the time they received the construction loan. On its face, the Guaranty covered "all obligations and liabilities . . . of the Debtor to the Bank . . . ." *Id.* at 184. It then attempted in scattergun fashion to include all possible obligations, including debts "contracted by Debtor alone or jointly and/or severally with another or others . . . ." *Id.*

Following execution of the loan and Guaranty Agreement, the Rodmans, Kraft, and Margulies opened a joint venture checking account. The deposit agreement required two signatures for all checks: either Kraft or Margulies *plus* either Morris or Leonard Rodman. *Id.* at 67. Statements were to be sent to the joint venture at the office of Kraft and Margulies, the active partners in the joint venture.

The events which form the basis of this action began during the period of April 29, 1966 to October 5, 1966, when numerous disbursements were made from joint venture account funds to meet obligations of Kraft and Margulies

on other projects.[1] American Security honored nine checks amounting to $63,603.76 although they did not carry the required Rodman signature. In addition, the bank diverted $51,031.02 from advances made to Gateway Square to pay Kraft and Margulies' indebtedness to American Security for prior projects. Finally, $17,970.41 was diverted to American Security by way of a debit memorandum signed by a bank officer to pay overdue interest on prior Kraft/Margulies loans.

In October, 1966 Kraft and Margulies revealed to the Rodmans the facts regarding these expenditures for nonproject obligations, whereupon the Rodmans immediately assumed management of the project. They notified American Security that all statements should be sent directly to them, rather than to Kraft and Margulies, and they executed a new signature card authorizing payment only of checks signed by Morris Rodman. The Rodmans also invested substantial amounts of their own funds to complete the project. They did not, however, notify American Security of the claims against it for wrongfully honoring the nine checks. In fact, they continued to pay interest on the entire amount despite their knowledge that portions of the advances had been directed toward payment of unrelated obligations.

In October, 1966, Kraft and Margulies assigned their interests in Gateway Square and the prior project, Gateway Gardens, to the Rodmans. The agreement, noting a debt of $675,000, specified that the value of the Kraft/Margulies interests in Gateway Gardens, i. e., $270,000, would be applied against their indebtedness; no credit was given for their interests in Gateway Square. The agreement also specified that the transfer would be deemed effective on January 1, 1966, thus giving the Rodmans

any tax losses on the properties for that year. In addition, Kraft and Margulies gave the Rodmans a promissory note for $405,000. No payments were ever made on the note and in 1969 the Rodmans took a bad debt deduction for the unpaid obligation.

In March, 1967, Morris Rodman sought and obtained from American Security an extension of the construction loan until August of that year. He intimated to an American Security officer that certain monies had been mishandled, but did not at that time apprise the bank of any claims against it. The extension agreement ratified and confirmed the existing note and deed of trust.

The Rodmans executed the permanent financing note to the long-term financer Connecticut Mutual in June, 1967. The total amount paid to the bank in satisfaction of the construction loan included principal and interest on amounts applied to other projects. One week later, the Rodmans notified American Security of their claims against the bank for the improperly honored checks and for proceeds diverted from the advances.

At the first trial, which considered only the issue of liability, American Security unsuccessfully defended on the basis of express and implied ratification, waiver, estoppel, contributory negligence, and lack of proximate cause. The trial court had already rejected American Security's defense based on applicability of 28 D.C.Code § 4–406(4) (1963) in its Pretrial Order of March 20, 1972. J.A. at 25. The defense of "voluntary payment" was also disallowed by the trial court because it had not been raised until after entry of the Pretrial Order establishing issues.[2] Id. at 18–20, 233.

At the second trial, the trial court held that American Security was not entitled to any setoff for tax benefits or for profits eventually realized by the Rod-

---

1. The record reveals that checks not signed by the Rodmans were also paid by other banks in which joint venture accounts existed. Claims against those banks were resolved by settlement.

2. The trial court also found that American Security may recover from Kraft and Margulies any damages which it is required to pay the Rodmans. No appeal as to this holding is currently before this court.

mans from their acquisition of the Kraft/Margulies interest in Gateway Gardens.

On appeal to this court, appellant American Security urges four basic arguments:

(1) that 28 D.C.Code § 4–406(4) bars recovery of funds whose diversion was indicated in a bank statement sent more than one year prior to the time the Rodmans reported it to American Security;

(2) that American Security is not liable for the diverted amounts because the Rodmans were contributorily negligent and because the bank's payment was not the proximate cause of the Rodmans' loss;

(3) that the Rodmans are precluded from recovery from American Security because their subsequent conduct ratified the diversion of funds, because the Guaranty Agreement made the Rodmans responsible for the prior debts of Kraft and Margulies to which the diverted funds were applied, and because the Rodmans' voluntary payments operated as a waiver of claims; and

(4) that American Security can offset against its liability the tax benefits and resale profits the Rodmans received from property transferred to them by the joint obligors.

These arguments will be discussed *seriatim*.

## II. Applicability of 28 D.C.Code § 4–406(4)

Appellant bank attempts to show that two checks and a debit memorandum for which the Rodmans obtained judgment are non-recoverable because the District of Columbia Uniform Commercial Code bars the action. 28 D.C.Code § 4–406(4). The statute provides that the customer's negligence in examining his bank statement and notifying the bank may preclude him from recovering from the bank for payment of items bearing unauthorized signatures or material alterations. *Id.* § 4–406(1). This preclusion operates only if the items were paid "in good faith" and the bank acted with "ordinary care." Regardless of the negligence of the bank or the customer, however, a maximum one-year limitation is allowed for the customer to assert claims against the bank for these items.[3]

---

**3.** 28 D.C.Code § 4–406 provides:

(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

 (a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

 (b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available

to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.

(5) If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party

In this case, two checks bearing Kraft's and Margulies' signatures were improperly paid on May 4 and 19, 1966. In addition, the debit memorandum for which the Rodmans were awarded recovery was charged to the joint venture account on April 29, 1966. These transactions were indicated in the May 25, 1966 statement sent to the partnership at Kraft's office, but no notice of these improper diversions of joint venture funds was given to the bank until June, 1967.

Judge Corcoran determined in his Pretrial Order of March 20, 1972, that section 4-406 did not bar the Rodmans' claim because the statements had not been "made available" to the Rodmans until October, 1966, when Kraft and Margulies admitted their misuse of funds. Relying on the Uniform Partnership Act, as adopted in 41 D.C.Code § 311 (1962), Judge Corcoran held that notice to the defrauding partners does not constitute notice to the partnership. J.A. at 25.

■ We find it unnecessary to determine at this time whether the Uniform Partnership Act controls the interpretation of the U.C.C. phrase, "makes the statement and items available to the customer." 28 D.C.Code § 4-406(1). The appellant's argument that the claim is barred as to these three items must fail for another reason: section 4-406 is simply not applicable to the facts of this case.

There is no doubt that the checks were "items" as defined in section 4-104(1)(g): "any instrument for the payment of money even though it is not negotiable but does not include money." Likewise, the Gateway Square Joint Venture was a "customer." See section 4-104(1)(e).

Section 4-406, however, operates to bar only claims for wrongful payment of an item bearing an *unauthorized* signature or a material alteration. In the case before us, the checks and debit memorandum contain no alterations; American Security urges, however, that the signatures of Kraft *and* Margulies, as opposed to the signature of only one of them plus a Rodman, are "unauthorized signatures." The term "unauthorized signature" is defined in 28 D.C.Code § 1-201(43) as "one made without actual, implied or apparent authority." The bank argues that the signatures of either Kraft or Margulies (or possibly both) were unauthorized. We agree with the *Maryland Court of Appeals in Wolfe v. University Bank*, 270 Md. 70, 310 A.2d 558 (1973), that absence of one of two or more necessary signatures does not constitute an unauthorized signature within the meaning of section 4-406. *Contra, Pine Bluff National Bank v. Kesterson*, 520 S.W.2d 253 (Ark.1975).

It may be possible to stretch the plain meaning of the definition "without actual, implied or apparent authority" to include a signature which is authorized only in conjunction with another signature or in the absence of an alternative signature. That interpretation, however, suggests other ramifications which we find unsatisfactory. For example, we doubt that a check signed by a Rodman, Kraft *and* Margulies could be reasonably be said to be unauthorized simply because it contained both of the alternative signatures.

Furthermore, this Procrustean interpretation of section 4-406 is unnecessary to meet the objectives of the U.C.C. The U.C.C., by design or oversight, has omitted any specific section granting a customer the right to demand that his bank recredit his account for items improperly paid. The existence of such a right, however, is strongly urged by the negative implications of section 4-401(1), which provides:

As against its customer, a bank may charge against his account any item which is otherwise *properly payable* from that account . . . ..

presenting or transferring the item a claim based upon the unauthorized signature or

alteration giving rise to the customer's claim.

*Id.* (emphasis added). *See* J. White & R. Summers, Uniform Commercial Code 558, § 17–3 (1972). The question of what is "properly payable" can be resolved by examining the deposit agreement and specific U.C.C. provisions regulating bank/customer relationships.[4] Here the deposit agreement clearly indicated that a Rodman signature was required before an item could be honored. Furthermore, no overriding policy considerations tempt us to supply bank protection omitted by the drafters of the U.C.C. An apparent justification for the protection afforded the bank in section 4–406 is that forged signatures of the drawer should be easily ascertainable by the customer, but not by the bank. The three-year limit on discovering unauthorized indorsements recognizes that, while initially the customer may be in no better position than the bank to recognize forged indorsements, he will no doubt receive notice of any such unauthorized indorsements within the prescribed time limits. *See* U.C.C. § 4–406, Comment 5. Similarly, the provision reasonably relieves the bank from the onerous task of continually updating its records to record those corporate or partnership officers with authority to sign as drawers. Placing this responsibility for discovery on the customer makes far less sense, however, where the bank may protect itself merely by consulting its signature card to determine the required signatures. We do not suggest that legislatures may not or should not relieve the bank of this responsibility if modern banking procedures so require. We cannot in good conscience, however, interpret the section in such a manner as to negate the contract between the bank and its customer absent clear statutory directive.

■■ Even stronger reasons exist for rejecting American Security's argument that a claim for the funds diverted by the debit memorandum should be barred.

The purpose of section 4–406(4) is to compel the customer to notify the bank of the wrongful payment of an item within a reasonable time. Under this section, a customer's duty to discover and notify is limited to notice that the item has been improperly paid; the section does not compel a customer to declare at that time his intention to avail himself of legal remedies against the bank. Here, the bank cannot complain that it lacked notice of the disbursement, since it not only authorized the diversion but also received the benefits thereof. American Security can not now rely on the Rodmans' failure to notify it of information already within its knowledge.

"[A] party to a transaction, where his rights are liable to be injuriously affected by notice, cannot willfully shut his eyes to the means of knowledge which he knows are at hand, and thereby escape the consequences which would flow from the notice if it had actually been received."

*NLRB v. Local 3, Bloomingdale etc.,* 216 F.2d 285, 288 (2d Cir. 1954), *quoting The Lulu,* 77 U.S. (10 Wall.) 192, 201, 19 L.Ed. 906 (1869).

The specific facts of this case, as detailed above, are thus not within the protective sphere of 28 D.C.Code § 4–406(4) and do not relieve American Security from liability.

### III. Contributory Negligence and Proximate Cause

The trial court rejected American Security's defenses of contributory negligence and proximate cause as irrelevant to a contract action. J.A. at 225. Although conceptual difficulties may arise from the introduction of terms such as "contributory negligence" and "proximate cause" into common law contract actions, the U.C.C., as adopted by 28 D.C.Code § 1–101 *et seq.,* does incorporate these traditional tort principles in

---

4. Other U.C.C. provisions specifically regulating this relationship include sections 3-114(2) (post-dated checks); 4-401(1) (overdrafts), 4-403 (stop payment orders); 4-404 (stale checks); 4-405 (customer's death or incompetence); and 4-407 (bank's right to subrogation).

Articles 3 and 4. *See, e. g.,* 28 D.C.Code §§ 3–406 (negligence substantially contributing to material alteration or unauthorized signature); 4–402 (requirement of proximate cause in recovering damages for wrongful dishonor); and 4–406 (customer's negligence and bank's contributory negligence).

■ Although the use of these defenses, therefore, may sometimes be possible in a contract action, we are compelled to affirm the trial court's decision on the facts of this case. As discussed above, the U.C.C. does not cover the precise situation involved here: checks lacking one of two required signatures and disbursements of loan advances contrary to the loan agreement. Where, as here, the U.C.C. does not apply, general contract principles govern. 28 D.C.Code § 1–103; *see also George Lumber Co. v. Brazier Lumber Co.,* 6 Wash.App. 327, 333–334, 493 P.2d 782–87 (1972).

Furthermore, American Security's argument that its breach was not the proximate cause of the loss suffered because the Rodmans might have signed the checks had they been requested to do so by Kraft and Margulies is far too speculative to merit serious consideration. If appellant's argument were the law, plaintiffs would face an impossible burden; they would be required not only to prove the loss resulting from defendant's breach of agreement, but also to negate the existence of all unrelated possible dangers. Even in tort law, proof of proximate cause does not require the plaintiff to eliminate all other possible causes. *See, e. g., Cornbrooks v. Terminal Barber Shops, Inc.,* 282 N.Y. 217, 222–223, 26 N.E.2d 25, 27 (1940). For these reasons, we reject the bank's proffered defenses of contributory negligence and proximate cause.

### IV. Ratification, Waiver, and Guarantee Agreement

The Rodmans, knowing full well that they intended to seek repayment from American Security for the unauthorized expenditures, nevertheless negotiated a renewal of the loan note without inform-

ing American Security of their claims. In fact, the Rodmans, as noted above, continued to pay interest on the full amount considered outstanding by American Security. These circumstances raise, and American Security presses on this appeal, the not insubstantial defenses (1) that the Rodmans ratified the unauthorized transactions and (2) that even if the transactions were not ratified, the voluntary payment of interest and principal by the Rodmans constituted a waiver of their right to object to the unauthorized transactions. We turn first to the issue of ratification.

■ Under that doctrine, a party can adopt a prior act that did not bind him but that was done or professed to be done on his account; the subsequent ratification relates back and provides original authorization for the unauthorized act. Restatement (Second) of Agency § 82 (1958). The crucial inquiry in determining whether an act was subsequently ratified concerns the *intention* of the party allegedly ratifying the act. *Id.* § 83; Seavey, the Law of Agency §§ 37–38. Although the intention to ratify can be inferred from the totality of the circumstances in each case, the courts hesitate to find ratification where the facts allegedly showing ratification can be easily explained on other grounds.

■ The trial court, although apparently regarding the Rodmans' conduct in this regard as less than appealing, nevertheless found that conduct did not constitute ratification of the diversion of funds: "However questionable [the Rodmans'] motivation might appear, it is evident that they had no intention of ratifying the unauthorized acts . . . by negotiating extension of the loan note." J.A. at 228. Since the issue of ratification is usually considered one of fact, *see, e. g., Fuller v. Eastern Fire & Casualty Insurance Co.,* 240 S.C. 75, 124 S.E.2d 602 (1962), this court can overturn the finding of the trial court only if it is clearly erroneous. Fed.R.Civ.P. 52(a). "Clearly erroneous" is defined as follows:

[A] finding is "clearly erroneous" if it is without substantial evidentiary sup-

port or if it was induced by an erroneous application of the law. Beyond that, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

*Case v. Morrisette*, 155 U.S.App.D.C. 31, 475 F.2d 1300, 1307–08 (1973) (footnotes omitted), *quoting, United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

This court has often stressed that it will not usurp the duty of the primary fact-finder by imposing its own findings. As we said in *Coleman v. United States*:

> The primary duty for finding the facts in a case rests with the trial court, and his determination in this regard is not to be lightly set aside, especially where, as here, he has made a detailed analysis of the evidence of both parties and has correctly applied the applicable law in making his determination.

85 U.S.App.D.C. 145, 176 F.2d 469, 472 (1949).

■ The record clearly supports the trial court's finding that there was no ratification. In addition to assuming control of the construction project, the Rodmans attempted to prevent any further diversion of funds by submitting a new signature card which authorized payment of checks signed only by Morris Rodman and by requesting all bank statements to be sent to them. J.A. at 181. The fact that the Rodmans negotiated a loan extension with American Security did not by itself imply the forsaking of any claim against the bank; it was instead an effort to complete the project as expeditiously as possible, a goal shared by American Security. *See* Tr. at 606 (April 4, 1972).

Even if the issue of ratification is a mixed question of law and fact, and thus not protected by the "clearly erroneous" standard of review, *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970), *appeal after remand,* 497 F.2d 40 (5th Cir. 1974), we find no reason to reverse the district court's findings that the Rodmans did not ratify American Security's breach of contract.

American Security argues that in order to establish its ratification defense it need not prove that the Rodmans subjectively *intended* to adopt and be bound by the unauthorized transactions. For support on this position, we are told that "there is substantial authority for the proposition that a principal 'must disavow the action of his agent within a reasonable time after the fact has come to his knowledge, or he *will be deemed* to have ratified it.'" Brief at 33 (emphasis in Brief) (citations omitted). We agree that a principal must, once the fact has come to his attention, elect to repudiate or ratify unauthorized actions within a *reasonable time*. What constitutes a reasonable period is a function of the facts of a particular case, and the courts typically attempt to assure that the principal is not permitted to postpone choosing between repudiation and ratification until he can determine whether the unauthorized transaction would be profitable. On the facts of this case, the Rodmans knew from the very beginning that the unauthorized transactions would be unprofitable; the diverted funds all went to nonproject ventures in which the Rodmans had no interest, and even the proceeds of the improperly honored checks were applied to pay expenses on projects in which Kraft and Margulies, but not the Rodmans, were interested. J.A. at 212–13. Their delay, consequently, in notifying American Security was not a delay in deciding whether to ratify; the Rodmans at all times intended to repudiate the unauthorized transactions. We therefore find no reason to overturn the finding of the trial court that silence for several months on the part of the Rodmans did not constitute ratification of the unauthorized transactions.

■ We do note, however, that by negotiating a renewal of the original loan

agreement and paying both the interest and the principal after they were aware of the unauthorized transactions, the Rodmans ran a serious risk that any attempt on their part to recover the diverted funds would be unsuccessful if American Security argued that the voluntary payment by the Rodmans constituted a waiver of their right to object to the unauthorized transactions. American Security now urges us to find that the trial court erred in refusing to consider this voluntary payment defense, which American Security raised *after trial.*

In its Pretrial Order of March 22, 1971, the trial court specified the defenses which were being asserted by American Security. J.A. at 19–20. The effect of this order was to limit issues at trial and to bar any defenses raised later. Fed.R.Civ.P. 16. *See also, Bernard v. U. S. Aircoach,* 117 F.Supp. 134, 137 (S.D. Cal.1953). The trial court's refusal to modify the order to allow American Security to raise the defense by way of a posttrial memorandum was not an abuse of discretion. Although Rule 16 provides for such modification in order to prevent "manifest injustice," the facts of this case do not lead us to believe that American Security can seriously claim the denial resulted in any injustice whatsoever. At the conclusion of pretrial proceedings and a week-long trial, allowing American Security to raise a new defense, which was not based on newly-discovered facts or new case law, would have been unjust to the plaintiff as well as inconsistent with the objectives of pretrial procedures. In sum,

> [c]areful use of the pre-trial procedures under Rule 16 will continue to be one of the most effective tools in the administration of justice only so long as it be regarded as a vital and integral part of the judicial process,

and enforced by a deliberate court with fairness.
*Associated Beverages Co. v. P. Ballentine & Sons,* 287 F.2d 261, 264 (5th Cir. 1961).

 Finally, we come to the defense based on the Guarantee Agreement.[5] The question as to the proper interpretation of this agreement is one of fact, *see, e. g., Mencoff v. A. D. Julliard & Co.,* 182 F.2d 236, 238 (1st Cir. 1950), and must be sustained as not "clearly erroneous." The court's findings that the agreement referred to debts "contracted jointly and/or severally with other coventurers in the Gateway Square Joint Venture," J.A. at 25, is reasonable in light of the facts that it was executed in support of a joint project construction loan completed that same day and that the total debt guaranteed was tied to the face amount of the loan. J.A. at 185, 190.

## V. Damages

American Security also challenges the award of damages ordered by the trial court, even if the finding of liability is affirmed. The bank objects to refusal by the trial judge to offset the damages by benefits purportedly received by the Rodmans from property transferred to them by Kraft and Margulies on October 29, 1966, as partial payment of the funds wrongfully diverted from the joint venture. Specifically, American Security argues that it was entitled to credits (1) for that portion of profits received upon sale of Gateway Square and Gateway Gardens in 1969 which represents the interests previously owned by Kraft and Margulies, and (2) for income tax benefits enjoyed by the Rodmans during the period from 1966 to 1969 by virtue of their ownership of the former Kraft/Margulies interests in the two apartment projects.

---

**5.** The Guaranty Agreement provides in pertinent part:

> [T]he undersigned hereby unconditionally guarantees to the Bank the prompt payment when due . . . of all obligations and liabilities . . . of the Debtor to the

> Bank . . . whether contracted by Debtor alone or jointly and/or severally with another or others . . . ..
> J.A. at 184.

The issue of mitigation of damages was originally considered by the trial court in its Pretrial Order of March 20, 1972. At that time the court held that only profits from the sale of Gateway Gardens, the prior successful venture, could be considered. Profits from the sale of Gateway Square were excluded because Kraft and Margulies had not contributed any capital to that project. J.A. at 26–27.

After a finding at the first trial of American Security's liability, a second trial was held on the issue of damages. At that time, the bank presented extensive expert testimony regarding the benefits received from transfer of the Kraft-Margulies interests in both Gateway Square and Gateway Gardens. These benefits were computed from analyses of the Rodmans' tax returns for 1966–69. Tr. at 13, 14 (Dec. 3, 1973). The Rodmans objected to mitigation on the theory that credits for tax benefits and subsequent profits were contrary to law and that the amounts presented by American Security's expert witness inaccurately·reflected the economic realities of the transactions. Plaintiff's Posttrial Br. Concerning Mitigation of Damages at 3–4; Tr. at 84–92 (Dec. 3, 1973).

At the second trial, the court ruled that profits from the sale of Gateway Gardens were not causally related to American Security's breach and thus not recoverable. J.A. at 242. Likewise the tax benefits were not properly considered in mitigation because such a result would place a "double economic burden on the plaintiff," id. at 240–41, citing Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 502–03, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), rehearing denied, 393 U.S. 901, 89 S.Ct. 64, 21 L.Ed.2d 188 (1968), by reducing the judgment to reflect tax savings and then by taxing the damages recovered. Because the court agreed with the Rodmans on the threshold issue of mitigation for profits and tax savings, it made no findings as to the accuracy of the expert witness's calculations.

On appeal, American Security challenges the conclusions of the second trial as well as the pretrial determination that the Gateway Square interests transferred to the Rodmans had no value. We shall examine first the issue of the profits from both projects and then the relevance of the Rodmans' tax savings to mitigation of their damages.

*Profits*

Neither party has been able to cite for us, nor do we find cases dealing with the precise issue presented: the time at which property transferred from a joint obligor in partial satisfaction of an acknowledged obligation is to be valued. As a result, we are compelled to look to analogous situations to determine the ruling which will best fulfill the aim of compensatory damages and also be most consistent with general principles of mitigation of damages.

One general principle cited by both parties is that the breaching party is entitled to a credit for benefits which plaintiff received solely because of the breach. 5 A. Corbin, Contracts § 1041 (1964); C. McCormick, Handbook on the Law of Damages § 41 (1935). Classic examples of this rule point out that in the area of employment contract breaches, the defendant-employee may mitigate his damages by showing that the employee received income from another job which he could not have accepted if his own contract had not been breached. *Id.* However, the same employer cannot mitigate his damages by showing that the employee obtained night work if the original job would have occupied only his daytime hours. *Id., see also* D. Dobbs, Remedies 827, § 12.6 (1973).

The general rule, however, is difficult to apply in this case for two reasons. American Security's breach arises from the same transaction which establishes Kraft and Margulies' liability. Thus the court must determine initially whether the breach of both, or just of Kraft and Margulies, caused the *transfer* of what proved to be appreciating assets to the Rodmans. Even if this causal relationship is found, the court must still consider whether the *profit realized three years later* was attributable to the

breach or to the Rodmans' wise management and investment of the property after transfer.

■ The trial court refused to find the required causal relationship between American Security's breach and the profits. We accept the bank's argument that American Security's breach is so closely linked with that of Kraft and Margulies that it must be said to have caused the transfer of the property to the Rodmans. We cannot, however, make the second mental leap to conclude that the profit from sale of those properties was caused by the breach either of the bank or of Kraft and Margulies. Rather it seems far more logical to assume that the profit was attributable to the Rodmans' decision to hold the apartments until their condition and the market were favorable for sale.

We find this situation analogous to the sale of goods regulated by Article 2 of the U.C.C. Under Article 2, a non-breaching party must act within a commercially reasonable time to mitigate his damages and is not allowed to speculate about market conditions at the expense of the breaching party. *See, e. g.,* U.C.C. §§ 2–706 (seller's right to resale); 2–712 (buyer's right to cover).

In the issue before us, we find that valuing the property transferred to the Rodmans as of the date of transfer is consistent with the general principles discussed above. If immediate resale occurs, any profit realized will be reflected in the transfer valuation; this is consonant with allowing credit for profits caused by the breach. If resale does not occur until a later time, the subsequent gain or loss will not be reflected; this result prevents the non-breaching party from speculating about market conditions at the expense of the joint obligors.

Appellant has intimated that a loss realized in resale of Gateway Square and Gateway Gardens would have increased the bank's liability. Appellant's Br. at 53 n. 35. This after-the-fact suggestion, of course, does not threaten American Security since the Rodmans in fact realized a gain. We reject this seemingly logical but inequitable converse of the rule proposed by American Security that valuation be determined as of the time of any resale which occurs before trial[6] and find it an additional reason for selecting time of transfer as the relevant time.

Having agreed with the trial court that October, 1966, is the relevant time for determining the value of the Kraft/Margulies interests transferred to the Rodmans, we must still decide whether the $270,000 valuation assigned to Gateway Gardens and the zero valuation of Gateway Square are supported by the evidence.

■ As to Gateway Gardens, American Security urges that it should not be bound by the value agreed upon by the Rodmans and Kraft and Margulies. The record, however, reveals no evidence to challenge this valuation *on the relevant date.* Absent any conflicting evidence, the transfer agreement, J.A. at 83, is substantial support for the court's finding that the property interests transferred were worth $270,000.

The bank challenges the zero valuation assigned to Gateway Square because the trial court found that "the Kraft/Margulies group had no capital in Gateway Square." J.A. at 27. American Security argues persuasively that the value of the transferred interests, which is not necessarily the same as the capital account, is the proper figure to be used. Appellant's Br. at 55–57. We agree that the defaulting partners' right to receive 50% of the profits after equalization of the capital account could in some factual situations result in a zero capital account,

---

**6.** American Security does not attempt to explain whether resale profits received subsequent to trial or during appeal should also be credited. However, the bank's insistence that any *actual* benefit should be accounted for could extend to sales completed long after the adjudication of liability and damages. If not, a financially stable party could protect himself simply by *retaining* ownership until judgment was entered.

but a valuable interest nevertheless in the project.

American Security, however, offered no proof of the value of the interest at the time of transfer, but instead relied upon hypothecated figures as to that interest at the time of resale in 1969. In light of this lack of evidence, the trial court was amply justified in accepting the zero valuation agreed upon by Kraft and Margulies in the transfer contract. J.A. at 83. This figure is reasonable in light of the fact that the building was only partially completed, that the major portion of the $2,500,000 construction loan had been advanced, and that substantial financial investments were still required to complete the building.

*Tax Savings*

 We turn finally to American Security's allegations that the trial court erred in concluding that tax benefits enjoyed by the Rodmans in 1966–69 were not relevant. Both parties cite *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), to support their positions. In *Hanover,* the Supreme Court ruled that tax benefits realized by *Hanover* when it purchased machines rather than renting them should not be deducted from the treble damages awarded for antitrust violations. *Id.* at 503, 88 S.Ct. 2224. The Court said that since Hanover would be taxed on its total recovery, deducting the tax savings from the amount awarded would result in reducing the award twice and, therefore, prevent Hanover from full compensation. *Id.* Judge Corcoran ruled that the double reduction rationale was applicable to this case and refused to consider American Security's evidence as to tax savings. J.A. at 241. Because the Rodmans had taken a bad debt deduction in 1969 for Kraft and Margulies' unpaid promissory note, any recovery from American Security will be taxable under the tax benefit rule of the Internal Revenue Code. *See* Int.Rev.Code of 1954, § 111; Treas. Reg. § 1.166–1(f) (1969).

American Security's major disagreement with the trial court's holding is that, although gross tax savings cannot reasonably be deducted, any *net* savings should be credited. These "net savings" would be computed apparently by determining the amount of adverse tax consequences flowing from the judgment and then subtracting that amount from the gross tax benefits computed by the bank's expert witness. Appellant's Reply Br. at 26.

This argument, while somewhat appealing on its face, overlooks basic procedural and practical problems as applied to this case. First, it assumes that the burden of proving the *net* benefit is on the Rodmans. On the contrary, an elemental principle of damages is that the defendant must bear the burden of proving mitigation. *See e. g., Coos Lumber Co., Inc. v. Builders Lumber & Supply Corp.,* 104 N.H. 404, 408, 188 A.2d 330, 333 (1963), *citing* 5 A. Corbin, Contracts 212, § 1039 (1964); *Foreman v. Caligari & Co.,* 204 Va. 284, 289–290, 130 S.E.2d 447, 451 (1963); and *Edgecomb v. Traverse City School District,* 341 Mich. 106, 115–116, 67 N.W.2d 87, 91 (1954). *See also* D. Dobbs, Remedies 189 (1973). Practical considerations also weigh against the bank's argument. As the trial court noted, accurate valuation of tax benefits and burdens cannot be accomplished for several years. J.A. at 241 n. 5. "It is unrealistic and impractical to compute now what may, or may not, be the ultimate effects." *Id.* These reasons mandate our affirmance of the trial court's application of *Hanover Shoe.*

## VI. Conclusion

For the reasons discussed above we reject the affirmative defenses presented by American Security. We hold that the trial court correctly denied reduction of damages to reflect resale profits or alleged tax benefits realized by the Rodmans from property interests they received from Kraft and Margulies. The judgment of the trial court is affirmed.

*Affirmed.*