JACK I. BENDER & SONS, Appellant,

v.

The TOM JAMES COMPANY, Appellee.

No. 93–7231.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1994.

Decided Oct. 14, 1994.

Rehearing Denied Nov. 28, 1994.

Mark London, Washington, DC, argued the cause and filed the briefs, for appellant.

Stephen Horn, Washington, DC, argued the cause, for appellee. With him on the brief was Angeline G. Chen, Washington, DC.

Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Sixteen months after a tenant moved out in breach of its lease, the landlord relet the abandoned premises together with a larger, adjacent space. The landlord sued in district court to recover lost rentals. The court denied recovery on a number of theories. Because the lost rents were fully offset by the revenues under the substitute lease that were reasonably attributable to the tenant's departure, and because we find that such an offset is allowable under District of Columbia law, we affirm.

\* \* \*

Bender & Sons owns an office building at 1120 Connecticut Avenue in the District of Columbia. The building (shown in the accompanying map) contains 19,468 square feet of retail space with direct access to Connecticut Avenue. Roughly 6,400 square feet of this space is at street level, with the remainder below ground level. The building has 67 feet fronting on Connecticut Avenue, of which ten are used for the entrance to the office portion of the building; the remaining 57 are available for retail street-level display.

Until the premises were renovated in May 1992, the 19,468 square feet had been divided into two separate spaces. About 1,000 square feet were occupied by the Tom James Company under a 10–year lease expiring in July 1996. These premises were all at street level and included 47 of the 57 feet available along Connecticut Avenue. The remaining 18,468 square feet of retail space (with only 10 feet of sidewalk frontage) had originally been leased to Mel Krupin for use as a bar and restaurant; Krupin had vacated the premises in July 1988, however, and Bender was unable to find a replacement tenant until after James's breach.

In December 1990 James announced its intention to vacate its 1,000 square feet at the end of January. Bender wrote back that it refused to accept the surrender of the premises and that it intended to hold James to the terms of the lease. James abandoned the premises on January 30, 1991 and paid no further rent after that date.

All was not lost for Bender, however. At some point around the time of James's notice of intention to vacate, the landlord had begun negotiations with The Gap, hoping to secure the national clothing retailer as a tenant for the *combined* retail space on Connecticut Avenue—that is, for the full 19,468 square feet. The negotiations took a long time but ultimately panned out. In May 1992, pursuant to a letter of intent, Bender demolished the walls separating the James space from the Krupin space and performed other work to ready the combined premises for The Gap. The parties signed a twelve-year lease for

the full 19,468 square feet on June 9, 1992, and The Gap's tenancy began that October.

Bender brought a diversity suit in federal district court against James (a Tennessee corporation), seeking the rent due for the remaining term of the lease, the costs incurred in securing The Gap as replacement tenant, and attorneys' fees. Bender won summary judgment on the issue of liability: James clearly breached the lease. Nonetheless, the district court denied Bender any recovery. The court held that Bender's efforts before and after the breach to secure a tenant willing to lease the entire 19,468 square feet proved that the landlord accepted the surrender of the premises immediately upon James's vacation in January 1991; in the court's view this acceptance canceled both the tenant's lease and any liability thereunder. Even if there had been no such acceptance, the court went on, the benefits Bender received as a result of the breach—the roughly $5,200,000 in rent due under the new lease with The Gap until its end in 2004—so exceeded the breaching tenant's rent obligation (roughly $900,000 until that lease's end in 1996) as to erase any injury suffered by the landlord. The court also denied attorneys' fees.

We affirm the district court's order entering judgment in favor of James. Although we find no basis for the court's determination that Bender accepted abandonment immediately upon James's breach of its lease with Bender, we agree that Bender suffered no net damages. Bender was entitled to rent from the time of James's breach to the end of that original lease (whether as actual rent or as contract damages), less a set-off for the portion of the value of the substitute lease to The Gap attributable to the inclusion of James's former premises (adjusted for the properly allocable share of the reasonable expenses incurred in securing The Gap's tenancy). The district court could find, without clear error, that the amount of that set-off would exceed James's liability for rent and expenses.

\* \* \*

■ The district court's finding that Bender accepted James's abandonment immediately upon its breach in January 1991 is clearly erroneous. Bender's repeated notices to James of James's liability for the unpaid rent, and the absence of any conduct inconsistent with an intent to hold James responsible and to relet on its account pursuant to the terms of the lease, dispel any inference of an intent to accept abandonment. See *International Comm'n on English in the Liturgy v. Schwartz*, 573 A.2d 1303, 1306 (D.C.1990) (no acceptance of abandonment where landlord notifies tenant of intention to hold tenant to terms of lease, even where landlord makes efforts to secure replacement tenant) (citing *Baskin v. Thomas*, 12 F.2d 845 (D.C.Cir.1926)); see also 2 Richard R. Powell & Patrick J. Rohan, *Powell on Real Property* § 17.05[1], at 17–77 to –78 (1994).

■ The parties disagree as to whether Bender's obtaining The Gap as a substitute tenant in 1992 represented an acceptance of James's abandonment or a re-entry and reletting by Bender on the tenant's account. Cf. *Cohen v. Food Town, Inc.*, 207 A.2d 122, 123 (D.C.1965). But given the lease's damages provision, which provides that the tenant remains liable for all rent should the tenant breach, Bender's recovery would be identical under either approach. If Bender's demolition of the boundary walls of James's former premises in May 1992 worked an acceptance of the tenant's surrender by law, cf. *International Comm'n*, 573 A.2d at 1306 n. 2, Bender would be entitled to the unpaid rent from the January 1991 breach through the May 1992 acceptance of the surrender, *plus* damages (as provided for in the lease) in an amount equal to the rent for the remaining term of the lease (June 1992 to July 1996), *less* the portion of the substitute lease rentals attributable to James's space (with an adjustment for the properly allocable reasonable expenses of bringing in the new tenant). See *Ostrow v. Smulkin*, 249 A.2d 520, 521 (D.C.1969); *Restatement (Second) of Property: Landlord & Tenant*, § 12.1 cmts. g, i. (1977). On the other hand, if Bender were simply re-entering the premises and reletting on the former tenant's account, it would be entitled to the amount owed under the remaining term of the original lease (January 1991 to July 1996) as rent, *less* a set-off for the allocable portion of the substitute lease

(again, adjusted for expenses). See *Truitt v. Evangel Temple, Inc.*, 486 A.2d 1169, 1172 (D.C.1984); *Restatement (Second) of Property: Landlord & Tenant*, § 12.1 cmt. i. (1977). In either case, District of Columbia law makes it clear that if a landlord succeeds in reletting the premises for a higher rent than was payable under the original lease, the breaching tenant may credit that surplus against its rent obligations for the period before the substitute lease was signed. *Truitt*, 486 A.2d at 1173. Thus, the only difference between the two scenarios (in this context)[1] is whether the amount owed the lessor for the period between May 1992 and July 1996 is seen as unpaid rent or as a factor in the calculation of contract damages.

■ Relying on dicta in *G & R Corporation v. American Security & Trust Co.*, 523 F.2d 1164, 1174 (D.C.Cir.1975), Bender argues that it is error to use *any* portion of the revenues from the substitute lease to set off rent owed under the original one because the lease with The Gap did not arise "solely" from James's breach; rather, argues Bender, it came from the landlord's combination of the leased premises' 1,000 square feet with the 18,468 square feet of the Krupin space. It is true that there must be a causal link between tenant's breach and landlord's benefit for the tenant to receive the set-off: the tenant may only reduce its damages by those "pecuniary advantages which [the landlord] otherwise would not have been able to obtain" had the tenant honored the lease. *Truitt*, 486 A.2d at 1173. But Bender's view is inconsistent with the cases allowing breaching tenants to offset their damages with substitute rents even when their landlords have made improvements or advertised to attract replacement tenants. These cases take account of the landlords' efforts by reducing the offset to cover the expense of securing new tenants, not by erasing the breaching tenants' credits for replacement rents. See, e.g., *International Comm'n*, 573 A.2d at 1306.

Even if *G & R* were controlling precedent,[2] the case would not help Bender. In *G & R*, we refused to allow the breaching party to offset its damages by the realized appreciation in the value of property that another breaching party had given the victims in partial settlement three years before; instead, we allowed a credit only for the value of the property at the time of its transfer. 523 F.2d at 1174. We disallowed the larger offset, not because the benefits received weren't "solely" the result of the defendant's breach, but out of a concern that providing such a credit would violate the principle that a court should not enable a breaching party to speculate about future market conditions at the expense of a non-breaching party—the principle, we pointed out, underlying the rule that the non-breaching party in a sale of goods must mitigate its losses within a commercially reasonable time. *Id.* As these concerns have no apparent application in this case, we believe that the sort of but-for causation required by *Truitt* is enough. Here it is clearly established. Documents from both sides of the negotiations over The Gap's tenancy make it clear that the deal was wholly contingent upon the recapture of James's space and therefore would not have been consummated but for James's breach. Joint Appendix ("J.A.") at 459–65.

■ Although Bender notes the absence of any D.C. precedent allowing an offset where the landlord includes additional premises in the substitute lease, it offers no reason why the District of Columbia courts should not extend to such a situation the cases preserving a breaching tenant's ability to set off rent surpluses even when the landlord has made improvements to the premises before seeking a replacement tenant. We can think of one possible reason: that the task of allocating substitute lease revenues between the premises made available by lessee's breach and

---

1. We note that the remedies available to a landlord seeking to recover unpaid rent may differ from those available for recovery of generic contract damages. See *Restatement (Second) of Property: Landlord & Tenant*, § 12.1 cmt. m (1977).

2. The *G & R* decision came four years after this court ceased to be an authoritative expositor of District of Columbia law. See *Belton v. Washington Metro. Area Transit Auth.*, 20 F.3d 1197, 1200 (D.C.Cir.1994); District of Columbia Court Reorganization Act, Pub.L. No. 91–358, 84 Stat. 475, 667 (1971).

those added by the landlord will typically be more difficult than that of allocating value between original premises and conventional improvements. In fact, as we shall see, it proves difficult here. But so long as the court uses reasonable caution in the computation and bears in mind that the tenant's breach has created the problem, we do not think the extra uncertainty of calculation is enough to justify a departure from the normal rule.

■ We thus turn to the question of how much of Bender's revenues from its lease to The Gap are to be credited against James's obligations. Bender is clearly correct in arguing that James may get credit only for the period from the beginning of the substitute lease to the end of the original one (that is, to July 1996); the district court therefore erred in crediting the entire value of The Gap's lease, calculated until *its* end in 2004.

■ As for the allocation of revenues between the 1,000 square feet of space originally leased to James and the additional 18,468 square feet of the Krupin space, the problem is trickier. The district court gave James credit for revenues from the entire area, even though the Krupin space was almost twenty times larger than the James space. Though at first blush this sounds unreasonable, the evidence provides some support for the district court's allocation. Both the written report and in-court testimony of real-estate appraiser Horstman suggest that the Krupin space—which was almost completely blocked from any street-level exposure by the James space—was so unappealing on its own that its rents would likely not have been large enough to offset the costs of readying it for a new tenant or converting it to a non-restaurant use. Bender's own actions support this conclusion: Bender found it impossible to lease the Krupin space by itself after it was vacated in 1988 until James decamped in January 1991, and any leasing prospects promising enough to merit a formal written proposal were contingent on combining at least part of the Krupin space with the James space. J.A. at 524–51.

■ Where two parcels have a greater total value combined than separate, any cal-

culation of the contribution of either to the combined value is necessarily indeterminate. Thus, if tracts $A$ and $B$ have rental values of $15,000 and $5,000 a year respectively when leased separately and are worth $100,000 a year aggregated, there is no clearly controlling rule for identifying each portion's contribution to the aggregate. If the tracts were in separate ownership and the owners agreed to lease them as a single parcel, they would have to allocate the total rent between themselves, and one cannot predict how they would do so—except to say that obviously neither would accept less than the value of his or her tract in separate use.

One possibility is for the owners to allocate the total in accordance with the ratio of the parcels' separate values—in the last paragraph's example, 3-to-1 (assigning $75,000 to the more valuable parcel and $25,000 to the less valuable). Adopting that method of allocation in the present case, if Horstman was right that the realizable value of the Krupin property alone was zero, then we would credit to James the *entire* value of The Gap's lease, up to the end of the term of James's original lease. (Bender argued that the stand-alone value of the James premises was about $45,000 a year, but if the stand-alone value of the Krupin property were zero, details about the James property would make no difference.) The Gap lease yielded about $390,000 a year, compared to roughly $90,000 a year from the James lease. With all values discounted to a single point in time (presumably January 1991), Bender's net gain for the period of July 1992 through July 1996 would handily exceed both the approximately $160,-000 in rentals that Bender lost from January 1991 through June 1992 and the landlord's reasonable expenses in securing the new tenant, leaving net damages of zero.

■ This was obviously not the only possible method of valuation, nor was it necessarily the best. Bender failed, however, to offer any plausible alternative theory: it made no sense to look, as Bender suggested, *only* to the stand-alone value of the James tract, completely disregarding the way in which its release unlocked the Krupin premises. We therefore cannot say that the dis-

trict court's finding of no damages was clearly erroneous.

Because the lessor has not succeeded on its claim for damages, we also affirm the district court's denial of attorneys' fees. See *Singer v. Shannon & Luchs Co.,* 779 F.2d 69, 71 (D.C.Cir.1985).

*So ordered.*