## PINE BLUFF NATIONAL BANK *v.*
## Kenneth KESTERSON et al

74-231 520 S.W. 2d 253

Opinion delivered March 17, 1975

*Jones, Matthews & Tolson*, for appellant.

*Owens & Fikes*, for appellees.

JOHN A. FOGLEMAN, Justice. This litigation was commenced on May 12, 1971, by Kenneth Kesterson and Harold Norton, who, along with W. A. Harris, were trustees of Pine Bluff Memorial Park Cemetery Permanent Maintenance Fund (to which we will hereafter refer as Trust Fund). Their complaint was against Harris, the sole owner, president and manager of Pine Bluff Memorial Park Cemetery, and against Pine Bluff National Bank to recover for funds allegedly withdrawn from the bank account of the Trust Fund by W. A. Harris, with the approval and consent of Bank, in violation of the trust and without proper authority. They sought an accounting.

Bank answered and made Pine Bluff Memorial Park Cemetery, Inc., (which we will call the cemetery corporation) Arkansas Memorial Gardens, Inc. and Tommy H. Russell, Trustee, third party defendants. The defenses pleaded were the statute of limitations, laches, and the bar of Ark. Stat. Ann. § 85-4-406 (Add. 1961). Appellant alleged that it had promptly mailed statements of the account of Trust Fund to the address designated along with all items paid out of the account by it, all of which it contended it had paid in good faith. Bank also alleged that any unauthorized withdrawal by Harris had been ratified by the plaintiffs (who are appellees here) and by the State Cemetery Board. The allegations relating to ratification by the Cemetery Board were that this board had authorized the third party defendant Arkansas Memorial Gardens, Inc. (which we will call Memorial Gardens), to operate the cemetery owned by the cemetery corporation upon the consideration that it would restore the trust fund. Memorial Gardens denied these allegations generally but,

admitting that it had agreed to restore the Trust Fund, denied that its agreement relieved the bank from liability. Russell, as Trustee, admitted the transfer to him by Harris of certain assets to apply toward restoration of the Trust Fund, but denied that they were sufficient to do so and resisted a marshalling of assets.

Appellee Fikes, as receiver of Trust Fund, then intervened alleging that Kesterson and Norton were guilty of breaches of their duties as trustees in that they failed to keep themselves informed of the condition and status of the Trust Fund and failed to protect it from loss. He sought to recover $30,000 from them. The intervenor also sought recovery of $11,000 from appellant bank based upon their alleged negligence in permitting Harris on October 16, 1967 to withdraw $11,000 deposited in the Trust Fund on that date by check bearing his signature alone. He alleged that this deposit consisted of the proceeds of three certificates of deposit issued by Bank to Trust Fund which had been endorsed only by Harris. The signature card for both the checking account and the certificates of deposit required the signatures of all three trustees. The receiver also sought to recover $8,000 from Memorial Gardens and Russell, and impress a constructive trust on the cemetery corporation, Memorial Gardens, and any funds received by Russell for restoration of Trust Fund.

To all intents and purposes, Bank pleaded the same defenses to the intervening receiver's complaint. During the course of the litigation, Harris died and a special administrator was appointed to defend, and the receiver's complaint against Russell was dismissed with prejudice. Before trial, the receiver amended his complaint to allege, in the alternative, breach of contract by Bank.

The chancery court rendered judgment against Bank for $11,000 for permitting the certificates of deposit to be cashed on the signature of Harris. The case was tried upon an agreed statement of facts along with the testimony of several witnesses.

Most of the facts are undisputed and there is little dis-

pute about any of them. The three trustees purchased a certificate of deposit for $8,900 on June 2, 1965, at which time they signed signature cards for it and for the cemetery corporation checking account requiring signatures of all three on behalf of the Trust Fund. No address was given for the Trust Fund on the signature card, but the Depositor's contract included this clause: "The bank is authorized to mail statements and cancelled checks to the last address known to the bank." All three trustees signed a check for $1,100 on the Trust Fund checking account for the purchase of another certificate of deposit on October 11, 1965. This check accompanied the October 1965 bank statement. Statements of the account were mailed by Bank on November 30, 1965, January 31, February 28, March 31, April 29, May 31, August 31, November 30, and December 31, 1966. On November 22, 1966, the checking account was increased from $135 to $1,400.66 to bring the total Trust Fund up to $19,400.66, the amount that should have been paid into it according to an audit for the Arkansas Cemetery Board. The other assets of the fund were the two certificates of deposit which have previously been mentioned, and a deposit in Guaranty Federal Savings & Loan Association at Pine Bluff amounting to $8,000.

On December 13, 1966, a check signed only by Harris was used to purchase a certificate of deposit for $1,100. On December 21, the bank paid a check on the account to W. A. Harris for $400 signed by Harris only. This check and the one for the $1,100 certificate of deposit accompanied the statement mailed at the end of the month which showed the balance to be $0.66. On January 3, 1967, a check of Guaranty Federal Savings and Loan Association for $8,-000, bearing the Trust Fund's endorsement by W,-A. Harris, trustee and Charles Arnold, trustee, was deposited to the checking account. On the same day a check on the account for the same amount signed only by Harris was deposited to the operating account of the cemetery corporation and used for proper purposes except for $750 used to pay individual income taxes of Harris. The check on the Trust Fund was included in its bank statement for that month.

There were no other transactions involving the Trust Fund account until October 16, 1967, when the proceeds of the certificates of deposit issued by Bank for $1,000, $1,100 and $8,900 were deposited to the Trust Fund checking account on endorsement by Harris only. A check on the account for $11,000 payable to the cemetery corporation signed by Harris only was paid on the same date. A statement showing the deposit to the Trust Fund Account and the payment of the check, along with the check itself was mailed to the usual address at the end of the month. It showed a balance of $0.66. There were no further transactions involving this account until March 12, 1970, when it was closed. All bank statements, at least since August 1966, were mailed to 6707 Dollarway Road, Pine Bluff at which the cemetery corporation office was located. This address for Trust Fund was shown on the certificate of deposit issued December 13, 1967 and on Bank's ledger sheet and statements at all times after September 30, 1965. The address shown on the ledger sheet was the address used for mailing statements which were folded so that the address thereon was exposed through the window envelope by which the statement was transmitted.

An audit report made by an auditor employed by the Arkansas Securities Division showed a liability of the cemetery corporation to the Trust Fund of $32,195.94 as of June 24, 1970. The last previous audit had shown a liability of $27,875.06 on September 16, 1969. There was no other audit or examination after that of November 1966. The $19,400.66, shown to be the amount due the Trust Fund then was the only money or assets which ever came into the Trust Fund. The auditor's review of the payroll account of the cemetery corporation into which the $11,000 deposit had been made on October 16, 1967, showed that except for three or four transfers made to other cemeteries and a check for $3,008 to Bank the money was expended for routine cemetery expenses. It was stipulated that only $5,160.77 of the $11,000 was expended for improper purposes.

The office of the cemetery corporation was located at 6707 Dollarway Road. The two trustees who instituted the

action first learned of the problems relating to the Trust Fund account about March 10, 1970, when Norton was present at a meeting of the Arkansas Cemetery Board, after having read a newspaper report about alleged irregularities. He called his attorney from the meeting and directed him to file suit. Norton testified that he never received or requested a statement of the bank account, although he knew they would be rendered and assumed they would go to the cemetery corporation office.

Russell appeared before the Arkansas Cemetery Board on March 10, 1970, on behalf of Memorial Gardens to obtain a permit to continue the operation of the cemetery. He then agreed on behalf of Memorial Gardens to pay a total of 25% of sales proceeds, rather than the required 15%, to Trust Fund, in order to reestablish it. As a result, the permit was issued and Memorial Gardens has continued to operate the cemetery. On March 25, 1970, Harris executed three deeds conveying property to Russell, as Trustee. Russell testified that Memorial Gardens had once owned the lands of the cemetery corporation and had foreclosed the Harris company on an indebtedness which appears to have amounted to $55,000. He stated that from accounts receivable of the cemetery corporation and other funds put into the Trust Fund about $20,000 of a deficit of approximately $40,000 had been restored. A part of this was attributable to the property Harris deeded to Russell, as Trustee, which Russell, in turn, deeded to the receiver. Russell said the receiver realized some $11,355.92 net from the Harris equity, a substantial part of which was payable in monthly installments of $176.53. Another $5,000 was contributed by Memorial Gardens. He disavowed any agreement to relieve the bank or any trustee of any liability to the Trust Fund.

Jim Hood, a director of Bank, who also attended the Arkansas Cemetery Board meeting in an effort to purchase the business and operate it, testified that Russell's agreement would have relieved the bank of liability.

The chancellor found no evidence of wrongdoing on the part of the trustees, that $5,260.77 of the $11,000 tran-

saction on October 16, 1967 was misappropriated by Harris, but that the evidence seemed to indicate the remainder was properly used; that there was no evidence that Russell agreed to exonerate the bank.

On appeal, Bank contends that the claim of the trustees and the receiver was barred by the absolute time limit of Ark. Stat. Ann. § 85-4-406 (Add. 1961), by the statute of limitations and by laches. The statute reads:

Customer's duty to discover and report unauthorized signature or alteration.

(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen (14) calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item (s).

(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one (1) year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three (3) years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.

The following committee comment is enlightening:

5. Whether the preclusion rule of subsection (2) operates or does not operate depends upon determinations as to ordinary care of the customer and possibly of the bank. However, subsection (4) places an absolute time limit on the right of a customer to make claim for payment of altered or forged paper without regard to care or lack of care of either the customer or the bank. In the case of alteration or the unauthorized signature of the customer himself the absolute time limit is one year. In the case of unauthorized indorsements it is three years. This recognizes that there is little excuse for a customer not detecting an alteration of his own check or a forgery of his own signature. However, he does not know the signatures of indorsers and may be delayed in learning that indorsements are forged. The three year absolute time limit on the discovery of forged indorsements should be ample, because in the great preponderance of cases the customer will learn of the forged indorsements within this time and if in any exceptional case he does not, the balance in favor of a mechanical termination of the liability of the bank outweighs what few residuary risks the customer may still have. In thirteen of the existing statutes there are

limitations on the liability of a bank for payment of items bearing forged indorsements which limitation periods range from thirty days to two years. In the remaining twenty-seven no provision is made for forged indorsements.

If there be any doubt about the applicability of the staute, it is easily resolved by the comment.

The principal question to be resolved is whether the checks drawn on Trust Fund checking account were paid on unauthorized signatures. Appellee Fikes contends they were not, because no signatures were forged and the signature of Harris was authorized. From reading the statute, the committee comment and the U.C.C. definition, we conclude that the coverage of § 85-4-406 is much broader than that and that the check was paid upon an "unauthorized signature." The authorized signature of Trust Fund required the joint signatures of three trustees. Any purported signature of Trust Fund with fewer signatures was an unauthorized signature. See, Ark. Stat. Ann. § 85-1-201 (28), (30), [Supp. 1973]; 85-3-403 (1), (3) [Add. 1961]. One of the purposes of the section was to replace existing state statutes which varied considerably in their applicability to unauthorized signatures as distinguished from forgeries. See Committee Comment 1. An unauthorized signature is one without actual, implied or apparent authority and includes a forgery. Ark. Stat. Ann. § 85-1-201 (43) [Add. 1961). It includes a signature made by an agent in excess of his authority. Comment 1 Ark. Stat. Ann. § 85-3-404 [Add. 1961]. The intention to extend the statute to cover unauthorized signatures beyond those which are forgeries seems clear to us. See *W. P. Harlin Construction Co.* v. *Continental Bank & Trust Co.*, 23 Utah 2d 422, 464 P. 2d 585 (1970); *Stauffer* v. *Oakwood Deposit Bank*, 19 Ohio App. 2d 68, 4800 2d 127, 249 N.E. 2d 848 (1969); *Salsman* v. *National Community Bank of Rutherford* v. *Breslow*, 102 N.J. Super. 482, 246 A. 2d 162 (1968). It also seems clear that the signature which was "unauthorized" is that of Trust Fund. For this reason, we disagree with the reasoning and result of *Wolfe* v. *University National Bank*, 270 Md. 70, 310 A. 2d 558 (1973) relied upon by appellees.

The trustees could not and the receiver cannot, as he attempts to do, shift the responsibility to the bank because Harris was regularly at the office of the cemetery company to which the bank statements were mailed, but the other trustees were not. A depositor is not excused from the discharge of his duty to examine the statement of his bank account with reasonable dispatch and care and to inform the bank of any errors by entrusting its performance to an incompetent or dishonest agent in the absence of reasonable diligence in supervising his conduct. The depositor must be held chargeable with knowledge of all the facts a reasonable and prudent examination of his bank statement and the accompanying items would have disclosed if made by one who had not participated in unauthorized withdrawals from the account. *Huber Glass Co.* v. *First National Bank of Kenosha*, 29 Wis. 2d 106 (1965), 138 N.W. 2d 157 (1965); *Morgan* v. *United States Mortgage & Trust Co.*, 208 N.Y. 218, 101 N.E. 871, LRA 1915 D 741 (1913) and accompanying annotation; *Bank of Thomas County* v. *Dekle*, 119 Ga. App. 753, 168 S.E. 2d 834 (1969); *Myrick* v. *National Savings & Trust Co.*, 268 A. 2d 526 [D.C. Ct. Ap. (1970)]; *Exchange Bank & Trust Company* v. *Kidwell*, 463 S.W. 2d 465 [Tex. Civ. App. (1971)]; see also, *Westport Bank & Trust Co.* v. *Lodge*, 164 Conn. 604, 325 A. 2d 222 (1973); *Faber* v. *Edgewater National Bank*, 101 N.J. Super. 354, 244 A. 2d 339 (1968); *Rainbow Inn, Inc.* v. *Clayton National Bank*, 86 N.H. Super 13, 205 A. 2d 753 (1964); *Screenland Magazine* v. *National City Bank*, 42 N.Y.S. 2d 286 (1943).[1]

It has also been held that the failure of joint depositors to discuss among themselves or inquire of their bank regarding their failure to receive bank statements over a three month period of time was evidence of negligence on the part of the depositors. *Terry* v. *Puget Sound National Bank*, 80 Wash. 2d 157, 492 P. 2d 534 (1972).

Section 85-4-406 (4) is not a statute of limitations. It creates an absolute bar because it is a rule of substantive law which is a condition precedent to an action. *Billings* v. *East River Savings Bank*, 33 A.D. 2d 997, 307 N.Y.S. 2d 606 (1970);

---

[1]We are not unaware of *Jackson* v. *First National Bank of Memphis*, 403 S.W. 2d 109 (Tenn. App. 1966) which appears to be contra, but feel that the rule stated is far preferable and more nearly in harmony with the express purpose of § 85-4-406 (4).

*Stauffer* v. *Oakwood Deposit Bank*, 19 Ohio App. 2d 68, 249 N.E. 2d 848 (1969). See also *Gennone* v. *Peoples Nat'l Bank*, 51 Pa. D. & C. 2d 529, 9 U.C.C. Rep. 707 (1971); *Dobbins* v. *National Union Ins. Co.*, 70 Misc. 2d 1087, 335 N.Y.S. 2d 480 (1972); *Terry* v. *Puget Sound National Bank*, 80 Wash. 2d 157, 492 P. 2d 534 (1972).

Since items on which the complaint is based were paid by Bank on unauthorized signatures, the one year statutory period applied to the liability of Bank on the checks written by Harris. The endorsements on the certificates of deposits should also have been discovered by the trustees by reason of their deposit to the Trust Fund checking account. Suit was not filed for more than three years thereafter, but there is evidence that some report was made to Bank within the three year statutory period relating to endorsements. No loss was sustained by Trust Fund, however, by reason of the endorsements, because the proceeds were deposited to the Trust Fund account. *Starkey Construction, Inc.* v. *Elcon, Inc.*, 248 Ark. 958, 457 S.W. 2d 509. See also, *Davis Aircraft Products Co., Inc.* v. *Bankers Trust Co.*, 319 N.Y.S. 2d 379 (1971). The misappropriation by Harris resulted from the payment of checks on his signature alone.

There was no evidence of lack of good faith on the part of the bank, so intervenors' action is clearly barred by § 85-4-406 (4). *Mansfield* v. *Jimden Realty Corp.*, 36 A.D. 2d 623, 319 N.Y.S. 2d 381; *Hardex-Steubenville Corp.* v. *Western Pa. National Bank*, 446 Pa. 446, 285 A. 2d 874 (1971).

Appellee - intervenor, in endeavoring to avoid the impact of Ark. Stat. Ann. § 85-4-406, argues that the cause of action on the certificates of deposit did not accrue until demand was made by the depositor and was not barred until five years later. Neither the trustees nor the receiver based the action against Bank on the certificates of deposit. The cause of action finally stated in the "Amended Intervention Complaint" is based entirely upon the payment of the $11,000 check drawn on the account with the signature of Harris only on October 16, 1967. We have previously pointed out that there was no loss occasioned by the deposit of the proceeds of the certificate of deposit in the bank account.

Appellee contends that the ordinary rules should not be applied to a trust fund. There is no exception made in any of the pertinent U.C.C. provisions. Furthermore, our case law does not support that argument. It is true that where a bank permits a trustee to withdraw funds from the bank account of the trust with notice that the trustee is commiting a breach of trust, it is liable for participation in the breach. *Drainage Dist. No. 7* v. *Citizens Bank*, 205 Ark. 435, 170 S.W. 2d 60. But this liability does not attach in the absence of notice of an intention on the part of the trustee to misappropriate the trust fund. *City of Helena* v. *First National Bank of Helena*, 173 Ark. 197, 292 S.W. 140; *Church of God in Christ* v. *Bank of Malvern*, 212 Ark. 971, 208 S.W. 2d 770. There is nothing to indicate that the bank had any notice that Harris intended to misappropriate funds withdrawn from the Trust Fund checking account and paid to the cemetery corporation. This would be a normal procedure in accomplishing the purposes of the trust.

The only evidence relied upon by appellee to show that Bank had notice of an intention on the part of Harris to misappropriate funds is testimony showing that sometime after the transfer of $11,000 from Trust Fund to the cemetery corporation account a check for $3,008 payable to Bank was drawn on the cemetery corporation account. Appellee contended that this testimony was sufficient to charge the bank with notice, when coupled with evidence that in December 1966, Bank honored a check on the Trust Fund account for $400 payable to Harris individually and that, after a transfer of $8,000 from the Trust Fund account to the cemetery corporation account in January 1967, $750 from the cemetery corporation account was used to pay personal income taxes of Harris. There was no evidence relating to the purpose for which the check for $3,008 was drawn. It was not shown that it went to pay personal obligations of Harris. We do not agree with appellee and find the evidence insufficient to charge the bank with notice of the intention of Harris to misappropriate trust funds.

We think the claim of the trustee and receiver was also barred by laches. If a claim had been timely asserted, the bank might have recovered losses from the assets of Harris or from the cemetery corporation.

Appellees concede that the point raised on cross-appeal need not be considered unless we agree with their view of the law on the direct appeal. Since we do not, we consider the cross-appeal to be mooted.

The decree is reversed and the cause dismissed.

HARRIS, C.J., not participating.