RASCAR, INC., Plaintiff-Appellant, v. BANK OF OREGON, Defendant-Respondent.†

Court of Appeals

*No. 77–565. Submitted on briefs October 31, 1978.—Decided December 27, 1978.*
(Also reported in 275 N.W.2d 108.)

† Petition to appeal denied.

For the plaintiff-appellant there were briefs by *Frederick F. Hillyer*, Madison.

For the defendant-respondent there was a brief by *Earl Munson, Jr.* and *Thomas A. Hoffner* of *La Follette, Sinykin, Anderson & Munson*, Madison.

Before Gartzke, P.J., Bablitch and Dykman, JJ.

DYKMAN, J. Simon (Sam) Bartus experienced financial difficulties as a result of rebuilding an automobile race track in Oregon, Wisconsin, in 1969. After foreclosure of the race track property was commenced, defendant Bank of Oregon was appointed receiver. In 1972, Bartus arranged for refinancing of the track, and hired Attorney George W. Corning to form Rascar, Inc. and to complete the refinancing arrangements. Bartus was president and Corning was secretary of Rascar, Inc. Bartus owned, and still owns, all the stock in Rascar, Inc.

On June 6, 1972, Rascar, Inc. opened a checking account with the Bank of Oregon. The signature card listed Sam Bartus as one of two required signatures, and either George W. Corning or G. Kent Corning as the required second signature. All business receipts were deposited into this account.

During July, 1972, the bank paid two checks drawn upon it totaling $3,500.00, each payable to George W. Corning. Each check was signed only by George W. Corning. During August through October, 1972, the bank paid nine checks, made payable to George Corning, totaling $9,046.91, each bearing the signature of George W. Corning and the forged signature of Sam Bartus.

Within not more than thirty days after each payment, the bank mailed the cancelled checks and a bank statement to Rascar's address, which was Corning's office.

In November, 1972, a creditor called Bartus to complain about a $200 check which was dishonored by the

bank. Bartus realized that something was wrong and immediately called the bank. The bank sent Bartus several bank statements which revealed that it had paid several checks for $1,000 each and one for $2,500. Bartus then called Corning and asked him about the checks. Corning admitted writing the checks, and promised to repay the money. He gave Bartus a mortgage on his home, but never repaid Bartus, despite numerous demands and threats by Bartus. The mortgage proved valueless because previous mortgages exceeded the value of the house. In 1974, Rascar, Inc. hired an attorney who made formal demand on the bank for the money paid out under Corning's single signature. The forged checks were not brought to the attention of the bank until the summons and complaint in this action were served.

The issues are:

(1) Where a customer requires two signatures on a check, is a check bearing a single signature an "unauthorized signature," requiring the customer to commence an action against the bank within one year from the date the paid check is returned to the customer?

(2) Did the bank know that Corning was a fiduciary empowered to draw checks on the Rascar account, making the bank liable to Rascar by virtue of the Uniform Fiduciaries Act (sec. 112.01(9), Stats.)?

The trial court found that checks drawn on the Rascar Inc. account which did not bear Bartus' signature were unauthorized, that no report of the unauthorized or forged checks was made to the bank prior to 1974, that Corning was not a fiduciary empowered to withdraw funds from the Rascar, Inc. checking account, and that the bank did not know that Corning was committing a breach of a fiduciary obligation. The trial court concluded that Rascar was barred from recovering on the forged checks and had not established a case under the

Uniform Fiduciaries Act on the two one-signature checks.

Rascar appealed from the entire judgment as entered. Its brief, however, attacks the judgment only with respect to the one-signature checks.

## Uniform Commercial Code

Section 404.406, Stats., part of the Uniform Commercial Code, deals with the general subject of the customer's duty to discover and to report unauthorized signatures or alterations on its checks. Section 404.406(4) provides that when a bank sends a statement of account accompanied by items paid,

[w]ithout regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer . . . discover and report his unauthorized signature or any alteration on the face or back of the item . . . is precluded from asserting against the bank such unauthorized signature . . . or such alternation.

If the absence of Bartus' signature results in an "unauthorized signature," then Rascar cannot recover from the bank under the U.C.C. because it did not report the unauthorized signature within the one-year time period required by sec. 404.406(4), Stats.

Section 404.406, Stats., refers to the signature of the "customer." A customer is any person having an account with a bank. Section 404.104(1)(e), Stats. Under the U.C.C., "person" includes an individual or an organization. Section 401.201(30), Stats. The customer is Rascar, Inc. An unauthorized signature is one made without actual, implied, or apparent authority. Section 401.201 (43), Stats.

The authorities are split on the question of whether the absence of a required signature constitutes an un-

authorized signature under the U.C.C. *Compare King of All Manufacturing, Inc. v. Genesee Merchants Bank & Trust Co.,* 69 Mich. App. 490, 245 N.W.2d 104 (1976), and *Pine Bluff National Bank v. Kesterson,* 25 Ark. 913, 520 S.W.2d 253 (1975) *with G & R Corp. v. American Security & Trust Co.,* 523 F.2d 1164 (D.C. Cir. 1975), and *Wolfe v. University National Bank,* 270 Md. 70, 310 A. 2d 558 (1973).

The courts in *G & R* and *Wolfe* focus upon each separate signature of the two required signatures, and find that a single signature check contains no forgeries or alterations, and that the single signature was authorized by the customer. They conclude that "absence of one of two or more necessary signatures does not constitute an unauthorized signature . . . ." *G & R,* 523 F.2d at 1169.

The two cases which held that the absence of a required signature constitutes an unauthorized signature are more persuasive. The courts in *King of All* and *Pine Bluff* find that the meaning of "unauthorized signature" encompasses more than forgeries or alterations. In *King of All,* 69 Mich. App. at 493, the court states that the *G & R* and *Wolfe* courts "failed to grasp that the signature referred to . . . is the signature of the customer who alleges that his account has been improperly debited." A critical analysis of *Wolfe* is in Willier & Hart, U.C.C. Reporter-Digest, sec. 4–406, A16 (Matthew Bender & Co.) :

The court's conceptualistic analysis of the signature of a limited partnership defeats the purpose of Section 4–406, which imposes upon bank customers the duty to inspect bank statements and cancelled checks and give timely notice of irregularities there. . . .

. . . .

The court avoided application of these sections by ruling that the absence of the second essential signature on the check did not render the present single signature an "unauthorized signature." The court's analysis is somewhat strained. No single agent had the authority to ne-

gotiate a check drawn upon the limited partnership's account; each had only the authority to co-sign. Under these circumstances, a single signature is actually unauthorized, although, pending the necessary co-signature, it is potentially an authorized element of a validly executed instrument. . . .

. . . Section 4–406 (4) provides a finality which is important for the security of banking institutions. It should not be circumvented by too fine an interpretation of what constitutes an "unauthorized signature."

■

When a bank's customer directs the bank to pay only those checks which bear two signatures, a two signature check is the "authorized signature" of the customer. The customer has not authorized the bank to pay one signature checks, so a check with only one signature does not have an authorized signature.

■

Because Rascar, Inc. did not report its unauthorized signature to the defendant within the one-year period provided in the statute, its claims under the U.C.C. are barred.[1]

*Uniform Fiduciaries Act*

Rascar alleges a second claim under the Uniform Fiduciaries Act (sec. 112.01, Stats.). Section 112.01 (9) reads:

(9) DEPOSIT IN NAME OF PRINCIPAL. If a check is drawn upon the account of his principal in a

---

[1] The trial court found that plaintiff did not report the unauthorized signature within one year of the time the bank statement and cancelled checks were made available to plaintiff. The trial court's decision and this decision discuss the absolute bar that §404.406 (4), Stats., provides under these circumstances. Because other parts of §404, Stats., also pertain to the relationship between a bank and its customer, we limit the holding in this case to our interpretation of §404.406 (4) and §112.01, Stats.

bank by a fiduciary, who is empowered to draw checks upon his principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith. . . .

A fiduciary includes an officer of a corporation. Section 112.01(1)(b), Stats. George W. Corning was the secretary of Rascar, Inc. Rascar's claim is that the bank breached a fiduciary duty in paying the one-signature checks.

The bank first contends that sec. 112.01(9), Stats., is inapplicable because Corning was not "empowered to draw checks upon his principal's account." The trial court found that Corning was not so empowered and Rascar does not challenge that finding. Instead, it argues that the bank treated Corning as if he were empowered and is therefore estopped from presenting its defense.

Equitable estoppel is not available to Rascar. Equitable estoppel denies a party the right to show the fact as it exists (here, that Corning was not empowered to withdraw funds) on the ground that equity and justice will thereby be promoted. *Sparks v. Kuss,* 195 Wis. 378, 396, 216 N.W. 929 (1928). The defense of equitable estoppel requires action or inaction on the part of the one against whom the estoppel is asserted which induces reliance by another to his detriment. *Chicago & North Western Transportation Co. v. Thoreson Food Products, Inc.,* 71 Wis.2d 143, 153, 238 N.W.2d 69 (1976) ; *Mercado v. Mitchell,* 83 Wis.2d 17, 26–27, 264 N.W.2d 532 (1978). The record discloses no reliance by Rascar on the bank's actions. Further, the right to assert equitable estoppel does not arise unless the party asserting it has acted with due diligence. *Monahan v. Department of Tax-*

*ation,* 22 Wis.2d 164, 168, 125 N.W.2d 331 (1963). A lack of diligence on the part of the party claiming estoppel is fatal. *Foellmi v. Smith,* 15 Wis.2d 274, 286, 112 N.W.2d 712 (1961).

Had Rascar exercised diligence it would have promptly discovered that Corning was withdrawing funds from the Rascar account.[2] Bartus, as president of Rascar, Inc., had access to the same facts as the bank. Thus, even assuming facts sufficient to create a defense of equitable estoppel, Rascar because of its own lack of diligence would be barred from asserting it.

Corning was not "empowered to draw checks" on the Rascar, Inc. account. Therefore, the bank is not liable to Rascar, Inc. under sec. 112.01(9), Stats.

*By the Court.*—Judgment affirmed.

[2] A depositor cannot be excused from its duty to examine its bank statements by pleading that it entrusted this duty to a person whose dishonesty caused the depositor's loss. *Huber Glass Co. v. First National Bank,* 29 Wis.2d 106, 138 N.W.2d 157 (1965).