In re SPEARS CARPET MILLS, INC.

SPEARS CARPET MILLS,
INC., Plaintiff,

v.

CENTURY NATIONAL BANK OF NEW ORLEANS, Robert Masson, G & A Carpet Mills, Inc., Dale Black and Gilbert Federbush, Defendants.

Bankruptcy No. 81–36.

United States Bankruptcy Court,
W.D. Arkansas,
Texarkana Division.

May 22, 1987.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge, sitting by designation.

The instant adversary proceeding was commenced by Complaint filed September 29, 1982, and later amended December 22, 1983, whereby the plaintiff, Spears Carpet Mills, Inc. (SCM), through its Chapter 7 trustee seeks both compensatory as well as punitive damages from the defendants in consequence of certain events surrounding the purchase of SCM by G & A Carpet Mills, Inc. (G & A), and the involvement of Century National Bank of New Orleans (Century), with that transaction and others that followed. Service on defendants Robert Masson and Gilbert Federbush was not accomplished hence the only defendants involved in the present action are Century and its then president, Dale Black (Black). Although service was made on G & A, it has failed to answer. On February 13, 1987, this court dismissed four of the plaintiff's six claims for relief leaving for trial claims two and three. The second claim for relief alleges that Century and Black were negligent in the preparation and processing of various checks, drafts, and wire transfers. This lack of diligence in the preparation and processing also forms the basis for the third claim whereby the bank is alleged to have breached its contract with SCM. SCM seeks $229,535.52 from Century on counts two and three and $162,000.00 from Century and Black jointly and severally on count two. Punitive damages in the sum of $898,598.09 are also requested from Century. Century and Black generally deny liability under either claims two or three.

The case came on for trial before the undersigned sitting by special designation on March 10, 1987.

### Findings of Fact

From the evidence produced at trial the facts as material may be summarized as follows:

1.

SCM was a carpet manufacturing mill situated in Hope, Arkansas. It began experiencing financial difficulties in the summer of 1979. Several workout efforts were attempted but in November, 1981, an involuntary Chapter 7 petition was filed against it which was later converted to a Chapter 11 in February, 1982. Upon motion of the trustee the Chapter 11 was converted to a Chapter 7 effective January 1, 1984.

A 1980 loan from FHA failed to stem SCM's downward slide and by 1981 the company was experiencing losses of $50,000.00 to $100,000.00 every month. With SCM in financial extremis, efforts were undertaken to find a purchaser for the company. Answering a Wall Street Journal sale ad, Gilbert Federbush, the chief officer of G & A, offered to purchase all of SCM's stock through G & A for the total price of $669,273.00. Little was or is known of Federbush's background and no investigation of him was undertaken in ad-

vance of SCM reaching an agreement with him. The sale was evidently one whereby SCM's stock would be transferred to G & A who, as a part of the purchase price, was to make a payment of $200,000.00 to SCM's preferred shareholders. By the terms of the purchase agreement, signed on April 14, 1981, the closing was to take place on April 15, 1981, with G & A accorded a 45 day right of recision. For the 45 day recision period following April 15th and until its expiration, James Lester, SCM's then president, was to remain as a member of the board of directors and G & A was to arrange for all company bank accounts to reflect that all withdrawals had to have the signature of at least two persons, one of them being that of Lester.

The $200,000.00 was to have been placed in an escrow subject only to the 45 day right of recision. G & A never put the money in escrow and the deal was not finally consummated until June 17, 1981, when Federbush presented three checks totaling $200,000.00 to a representative of the preferred stockholders. It is with this purchase transaction that the involvement of Century begins.

Century is a fairly small bank ($28,000,-000.00 in deposits) chartered under the laws of the State of Louisiana with its principal place of business in New Orleans. During the period in question, Black was its president. He was introduced to Federbush by an individual named John Cerise, an existing bank customer. Federbush and Cerise were also looking at other New Orleans property at the time.

On May 15, 1981, Federbush opened an account for G & A at Century by first taking a $250,000.00 loan in the form of a certificate of deposit and pledging it as collateral. Corporate borrowing and check signature resolutions were prepared for G & A on bank forms. The G & A borrowing resolution, signed by Federbush and Masson authorized either Federbush, its president, or Masson, its secretary, to borrow and the G & A signature resolution allowed checks to be drawn by either acting alone. Neither forms were completely filled out in that the borrowing resolution was undated

and the signature resolution was both undated and unsigned. Black testified that it is typical bank practice to require such resolutions for the opening accounts and they would normally be fully completed. He did not, however, handle the form completion himself and agreed that the omitted dates and signatures were an oversight.

On June 10, 1981, Federbush and Masson opened an account at Century for SCM by making a deposit of $15,000.00. SCM had previously conducted all of its banking with banks in Hope, Arkansas. As with G & A, two corporate resolutions were prepared for SCM on bank forms. The SCM borrowing resolution dated June 18, 1981, was signed by James W. Lester, as SCM's president, and Federbush as secretary. Either one, acting alone, was authorized to borrow. The SCM check signature resolution was undated and was signed by Federbush as secretary. The check signature resolution form at the top, however, bears the name of Robert Masson, secretary, as the certifying officer. The two SCM resolution forms were typed up by someone in the bank's customer service department. The check signature resolution provides for checks and withdrawals to be made by the, "secretary with president or vice-president two of three".

In opening checking accounts Century, consistent with normal banking practice, requires signature cards. Black acknowledged that different types of cards are used for individuals, corporations, partners and trade names. Although Black knew SCM was a corporation and knew what its business was, Century, in opening SCM's checking account on June 9, 1981, had SCM, through its officers, complete a signature card used for individual, joint & trade name accounts. Black did not personally prepare the card and, while acknowledging the use of an individual card for a corporation was unusual, said that so long as the corporate name and required signatures appeared, the individual card would suffice. The SCM signature card bore the full corporate name of SCM and was signed by Federbush, Lester and Masson. Consistent with the SCM corporate check signature resolution, the signature

card allowed for checks to be written by any two of these individuals. In opening the account, Black spoke to Lester in order to confirm Federbush's identity. According to Black, Lester never advised him that Lester would have to authorize withdrawals nor was there any suggestion to that effect. Nothing in evidence suggests that Black or anyone at Century was aware of the G & A–SCM purchase contract requirement mandating Lester's signature on all withdrawals during the 45 day recision period.

2.

G & A's purchase of SCM's preferred stock for $200,000.00 was, in part, paid for by two cashier's checks in the sum of $23,-000.00 and $165,000.00 issued by the bank on June 17, 1981, and payable to G & A Carpet Mills. Both were signed by Black and bear the endorsements of Federbush and Masson. The $23,000.00 check denoted John Cerise as the remitter whereas no remitter on the $165,000.00 check was disclosed. The agent for the preferred shareholders did not know who Cerise was and made no inquiry as to who the remitter of the $165,000.00 check was. According to the testimony of Black and an officer of a competing bank, there is no requirement that the name of a remitter appear on cashier's checks.

The $162,000.00 cashier's check was drawn against the checking account of SCM rather than an account of G & A and resulted in an overdraft and issuance of a notice of insufficient funds. A debit advice for the $162,000.00 check was issued on June 17, 1981, and was signed by Federbush and Masson. The check itself, while issued on June 17, was not actually posted until June 18th because at the time of issuance the bank had closed for the day and in such situations it would be normal banking practice to debit the account on the next business day. According to the testimony of an officer of a competing bank, the normal practice is to immediately post a cashier's check against the depositor's account, but if the check is issued after banking hours, then it would not be out of the ordinary to debit the account the next day.

How the unusual event of the overdraft occurred was explained by Black as resulting from the cashing of eight items as checks which were actually drafts and should not have been run through the checking account. Between June 10th and June 15, 1981, SCM issued eight drafts totaling $88,127.31. These drafts were very similar in appearance to a check and differed only in small but readable type stating "draft payable on approval". Black testified that drafts are not written against checking accounts and are not prepared by the bank and would not normally bear (as these did) checking account encoding. Because of the size of the type, the checking account encoding, and the general appearance of the eight drafts, they were at first treated as checks by Century personnel and not recognized as being drafts until actually later. A bank officer from another bank testified that drafts as distinguished from checks have conditions attached and are not handled through the automatic check processing. In looking at the eight drafts, she said because of their appearance she would not have regarded them as drafts, but if someone had noticed the draft notation, then they should have been handled as drafts. The eight drafts were not prepared by the bank and she agreed that a Century employee could have been confused.

Four of these drafts totaling $69,374.31 were processed on June 16, 1981, and four totaling $18,753.00 were processed on June 17, 1981. The June 16, 1981, drafts were charged back on June 17, 1981, and the June 17, 1981, drafts were charged back on June 18, 1981. When the $162,000.00 cashier's check was issued after the bank closed on June 17, 1981, only the four June 17th drafts had been processed, but when the computers went up the following day, the remaining drafts went through leaving an account balance of $143,941.66 which caused the cashier's check to overdraft. Century, by charging back the eight drafts, cleared the overdraft and the account then had sufficient funds to cover the cashier's check. Black testified that while unusual,

it was not unheard of for a bank to charge back erroneously processed drafts. After this experience, Century advised SCM not to issue drafts that were similar in appearance to checks.

### 3.

After assuming control of SCM, G & A and its officers undertook a wholesale plunder of SCM's remaining cash assets. Dave Oates, SCM's in-house accountant during 1981, was aware of the sale to G & A and by virtue of his accounting responsibilities was also aware of SCM's usual suppliers and others with whom SCM normally did business. Commencing with the June bank statements from Century, Oates began to reconcile checks, drafts, and other wire transfers charged against SCM's Century account with what he felt were SCM's legitimate accounts payable for the months of June through October. At trial he went through the bank statements for these months as well as various debit advices and checks received in evidence. From Oates' trial testimony as well as a review of the various debit advices and checks, the plunder of SCM commenced with numerous unexplained withdrawals.

In June and July, 1981, a series of eight wire transfers totaling $86,558.00 were made as reflected in eight debit advices which first came to Oates' attention after the fact. According to Oates, none of them had any legitimate business purpose as far as SCM's business was concerned. The July statement additionally reflects debit advices for: a Masson overdraft of $2,500.00; $500.00 interest payment on a Cerise loan; and $37.56 check printing ($18.78 of which was legitimately for SCM's own account). Save for the SCM check printing expense, these additional July statement items had nothing to do with SCM's business so far as Oates could tell.

The August statements also reflect a series of four wire transfers totaling $26,540.00 and a $20,000.00 debit advices signed evidencing withdrawal of funds for cashier's check payable to Mason. None of these items had any legitimate SCM business purpose according to Oates. There was also issued in August a counter check for $50,000.00 which, although, for a legitimate purpose, bore only one signature—that of Robert Masson.

The September 25, 1981, statements reflects eleven debit advices for wire transfers and bank charges made totaling $100,255.00. Of this amount, payments totaling $57,000.00 were recognizable by Oates as legitimate. In addition to the September wire transfers, a Century debit advice indicated a $2,500.00 credit to John Cerise's account and a $463.74 interest payment on a Cerise note, neither of which were legitimate business expense according to Oates. The October 23, 1981, statement reflects one $1,760.00 wire transfer which Oates indicates was not for a legitimate business purpose.

None of the debit advices pertaining to wire transfers bear any signature of SCM officers nor is it possible from the face of the debit advices to discern whether required authorizations were, in fact, obtained.

Oates was familiar with SCM's records and testified that the payees cited by him as illegitimate were not creditors of SCM. Concerned with what appeared to be serious discrepancies, he attempted to inquire of Masson and Lester and at times wrote memos including one dated October 8, 1981, to Masson expressing his concern. The only reaction he got was advice from Lester to quit writing memos. Curiously, Oates never contacted anyone at Century regarding the concerns he had over how the SCM account was being handled.

### 4.

Wire transfers are electronic transfers whereby a bank customer can cause funds to move from one account to another without actually drawing a check. The method used to implement a wire transfer system varies among banks, with large banks now requiring a signed agreement and a written authorization by a person verified by the bank to have authority to make such a transfer. Even where such formal requests are in place, a customer may still negotiate a wire transfer over the phone if the voice is recognized and a bank officer

authorizes the transfer. Smaller banks more nearly the size of Century do not always require an agreement nor do they require written authorizations for in person or phone requested wire transfers so long as the customer is recognized. Under normal circumstances, a bank employee handling such a wire request would not check the signature card because she or he would already have been advised that wire transfers for that particular account are alright. According to Black, the policy of Century as to wire transfers was that of a small bank. He was aware of the two signature requirement for SCM's account withdrawals, but no written agreement or authorization was used for wire transfers where the customer was known by Century and the voice of the requesting person was also known. Apparently the wire transfers pointed out as illegitimate by Oates were, for the most part, phoned in as none of the debit advices for these particular transfers are signed by an SCM officer. Ten of the wire transfer debit advices bear a notation "per Robert Masson" indicating apparently that Masson was making the requests. The $50,000.00 counter check issued on August 4, 1981, and acknowledged by Oates as probably legitimate was nonetheless contrary to the signature card requirement in that it bears only one signature—that of Robert Masson. According to Black, it was Century's usual practice to get verficiation from the other signatory where checks against accounts requiring two signatures bore only one. Black could not be sure that verification was obtained in every instance, nor could he recall why Masson, using a counter check, was allowed to issue a check with only one signature. Century could provide no log book or other record of instances where verification of either wire transfer requests or single signature checks were obtained.

5.

Century did not contact anyone at SCM's Arkansas headquarters about the banking practices of SCM, nor was it every contacted by any SCM officer expressing dissatis-faction over how the account was administered. By September, 1981, the continuing issuance of drafts by SCM began causing problems. When Century began receiving complaints because the drafts were going back, it investigated further and found that drafts received from eight banks nationwide between September 3 and January 11, 1982, were not Century drafts. On January 22, 1982, Century notified the FBI reporting unpaid SCM drafts of $898,598.09.

### Conclusions of Law

The trustee alleges Century was negligent in accepting for payment the June through September wire transfers, checks and interest payments for which no legitimate SCM business purpose existed for the reason that these items were debited to SCM's account without the required two signatories. The total of these items for which recovery is sought is $229,535.52. The trustee further charges that Century breached its contract with SCM when the foregoing items were paid.

Negligence is also charged Century as regards the method used by it in opening SCM's account in the first place and the circumstances surrounding the issuance of the $162,000.00 cashier's check without the remitter noted. The manner in which Century charged back the eight draft items in order to cover the $162,000.00 cashier's check is claimed by the trustee to be so extraordinary as to warrant punitive damages of $898,598.09, the amount of unpaid SCM drafts ultimately reported to the FBI.

Black, it is asserted, ought to be personally liable for allowing withdrawal of the $162,000.00 from SCM's account to cover the cashier's check.

The court will first address the merits of claim three by which SCM seeks to recover $229,535.52 representing check and wire transfer withdrawals improperly honored by Century because certain required signatures were absent. Whether LSA–R.S. 10:4–406 (U.C.C. § 4–406) applies to the case at bar is the decisive issue regarding claim three.[1] If the court concludes that

1. LSA–R.S. 10:4–406 provides as follows:

(1) When a bank sends to its customer a statement of account accompanied by items paid in

absence of one of two required agent or principal signatures on a corporate check constitutes an unauthorized signature, section 10:4–406(4) would prevent SCM from recovering on many of the checks to the extent SCM failed to notify Century within one year of receiving the account statements that the withdrawals contained therein were honored despite an unauthorized signature.

The applicability of section 10:4–406(4) to this case has been addressed on two previous occasions. Bankruptcy Judge Fussell, by Memorandum Opinion dated April 1, 1986, denied SCM's motion for summary judgment. Judge Fussell excused Century by finding that SCM failed to " 'exercise reasonable care and promptness to examine the [bank] statement and items to discover [any] unauthorized signature ... [to] notify the bank promptly after discovery thereof.' LSA–R.S. 10:4–406."

 Implicit in Judge Fussell's denial of the motion for summary judgment is a determination that the absence of a agent's required signature or authorization on a check or wire withdrawal constitutes an unauthorized signature pursuant to section 10:4–406. On November 6, 1986, Judge Fussell again denied SCM's renewed motion for summary judgment refusing to

follow the recent case of *In re Florida Airlines, Inc.,* 57 B.R. 113 (Bankr.M.D.Fla. 1986). Century argues that Judge Fussell's earlier espousal is the law of the case in regard to application of section 10:4–406. The court disagrees that it is bound by Judge Fussell's earlier decisions. Adherence to the doctrine of the law of the case is discretionary where a prior ruling in the same case is made by another judge. *ACF Industries, Inc. v. Guinn,* 384 F.2d 15 (5th Cir.1967) *cert. denied,* 390 U.S. 949, 88 S.Ct. 1039, 19 L.Ed.2d 1140 (1968). Nevertheless, this court, independent of Judge Fussell's holding, believes that the absence of a corporate agent's required signature on a check is an unauthorized signature as contemplated by section 10:4–406.

The courts are hopelessly split on the issue of whether a missing signature is an unauthorized signature for purposes of U.C.C. § 4–406. One line of cases have held that a missing signature is not an unauthorized signature. *See G & R Corp. v. American Security & Trust Co.,* 523 F.2d 1164 (D.C.Cir.1975); *Nagle v. LaSalle National Bank,* 472 F.Supp. 1185 (N.D.Ill. 1979) (following controlling state court decision of *Madison Park Bank v. Field,* 64 Ill.App.3d 838, 21 Ill.Dec. 583, 381 N.E.2d 1030 (1978); *Wolfe v. University Nat. Bank,* 270 Md. 70, 310 A.2d 558 (Ct.App.

good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

 (a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

 (b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of

any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement of such alteration.

(5) If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim.

1973). The analysis and results of the *G & R Corp.* and *Wolfe* cases have been strongly criticized by recognized authorities on the Uniform Commercial Code. *See* Willier & Hart, U.C.C. Reporter Digest § 4–406 A16. (1985); B. Clark, *The Law of Bank Deposits, Collections and Credit Cards,* 6–25 (1981).

The seminal case holding that a missing signature is an unauthorized signature is *Pine Bluff National Bank v. Kesterson,* 257 Ark. 813, 520 S.W.2d 253 (1975) which was relied on by Judge Fussell. Contrary to the *Wolfe* line of cases, the *Kesterson* court centered on the authorized signature of the trust customer on whose account the checks were drawn, and did not center on the signatures or lack thereof of three trustees whose signatures, by the terms of the signature card, were necessary to authorize withdrawal on the particular account. The court opined that the "authorized signature of Trust Fund required the joint signatures of three trustees". *Id.* 520 S.W.2d at 258. An explanation of this analysis is amply set forth in *Rascar, Inc., v. Bank of Oregon,* 87 Wis.2d 446, 275 N.W.2d 108 (1978) where the court stated:

> When a bank's customer directs the bank to pay only those checks which bear two signatures, a two signature check is the "authorized signature" of the customer. The customer has not authorized the bank to pay one signature checks, so a check with only one signature does not have an authorized signature.

*Id.* 275 N.W.2d at 111. *See also LaSara Grain v. First Nat. Bank of Mercedes,* 673 S.W.2d 558 (Tex. 1984); *King of All Manufacturing, Inc. v. Genesee Merchants Bank and Trust Co.,* 69 Mich.App. 490, 245 N.W.2d 104 (1976). This court's position is in line with the policy and purpose behind section 4–406 of the Uniform Commercial Code in providing finality and a duty upon customers of a bank to promptly examine their bank statements and cancelled checks. *See* U.C.C. § 4–406 Official Comments 5, 7.

Regardless of the care or lack thereof, of Century or SCM, section 10:4–406 bars the trustee from recovering on checks or wire transfers which may have been improperly honored when Century has not been notified of the improper payment within one year from the time the statements were made available to SCM.

In the case at bar, Oates testified that he was responsible for examining the statements and cancelled checks, and compared them against his own records of payments. While the court is unaware of the exact date when SCM received each statement, it appears that the statements were routinely received a few days following the statement date. Oates testified that he examined the statement dated September 25, 1981, and issued a memorandum on October 8, 1981, to Masson informing him of withdrawals as evidenced by debit advances which appeared to Oates to be for nonbusiness purposes. The instant adversary proceeding was commenced by the trustee on September 29, 1982, which would serve to notify Century that various withdrawals may have been authorized. Giving the trustee the benefit of the doubt, the court will consider notice of the withdrawals in the September and October statements to have been given the bank within the one year period of LSA–R.S. 10:4–406.

Because the court considers the trustee's claim for relief concerning withdrawals which are reflected on the September and October statements not to be barred by the one-year period of section 10:4–406(4), the court must determine if the trustee can recover on those withdrawals for non-business purposes. If Century exercised ordinary care in honoring the withdrawals contained in the September and October statements, the fourteen day notice requirement of section 10:4–406(2)(b) applies, has not been met, and the trustee is barred from recovery.

SCM has the burden of proving that Century has not exercised ordinary care in honoring the electronic withdrawals of SCM. *See Thoreson v. Citizens State Bank,* 294 N.W.2d 397, 401 (N.D. 1980); *Ossip–Harris Insurance Inc. v. Barnet Bank of South Florida,* 428 So.2d 363, 365 (Fla.Dist.Ct.App.1983); Uniform Commer-

cial Code § 4–406 Official Comment 4. The trustee on behalf of SCM, has not met his burden in establishing lack of ordinary care by Century in allowing the electronic withdrawals. There is no requirement that authorization to negotiate checks be in writing. *See Furrow v. Fidelity National Bank of Baton Rouge,* 231 So.2d 687, 689 (La.App.1970). The testimony and other evidence is insufficient to establish that Century failed to use ordinary care in honoring the wire transfer withdrawals as reflected on the September and October statements. Moreover, Black testified that Century's normal procedure is to verify wire transfers by confirming all required signatures. Although Black did not know whether verification was obtained in each instance, the usage and custom of Century is competent evidence to prove that the procedures were followed. *See England Nat'l Bank v. United States,* 282 F.121, 125 (8th Cir.1922); *Cooley v. First Nat. Bank,* 276 Ark. 387, 635 S.W.2d 250, 252. Thus, the trustee is barred from recovering on the basis of the September and October statement withdrawals, because the bank was not notified within the fourteen day notice period of section 10:4–406(2)(b).

■ The trustee, pursuant to claim two also seeks to recover under a negligence theory, and seeks punitive damages as well. The court does not believe negligence has been established in honoring the wire transfer withdrawals. However, even if negligence had been established, a negligence claim based upon unauthorized withdrawals in the case at bar is inappropriate. The trustee, in his post-trial brief, admits that the relationship between SCM and Century National Bank is contractual. The trustee cannot seek recovery on one set of facts, under both contract and tort. As one Louisiana court has held:

> While some cases may refer to the negligence of a depositor or the negligence of a bank employer, the relationship between the bank and its customers, in the absence of specific statutes to the contrary, is not covered by the rules applicable to offenses and quasi offenses.

As between a bank and its depositor, the relationship is covered by contract. *Strother v. National American Bank,* 384 So.2d 592, (La.App.1980).

■ Even if the trustee was entitled to pursue his claim on a negligence theory, and was entitled to recover actual damages pursuant thereto, punitive damages would not be allowed. While punitive damages are not generally recoverable in a contract action, *Curtis v. Partain,* 272 Ark. 400, 614 S.W.2d 671, 673 (1981), Louisiana does not allow punitive damages under tort or contract claims. *See, e.g., Fagot v. Cirovola,* 445 F.Supp. 342, 344 (D.C.La.1978).

■ The trustee also alleges that Century was negligent in not naming a remitter on the cashier's check. Century did not have a duty to, on either a negligence or contract theory, to list the remitter on the cashier's check. The evidence is that remitters are often left off of cashier's checks. Remitter notations on a cashier's check are "information to the maker and not conditional or notice of the payee." *Schneider v. United States,* No. 84–A–1603 (D.Colo. Nov. 28, 1986) [available on WESTLAW, 1986 WL 13636]. Thus, filling in of the remitter line on a cashier's check is akin to the filling in of the memo line on a personal check; helpful, but not required, and of no legal effect. Even if negligence were established concerning the drawing of the cashier's check, the trustee would be barred from recovery because the trustee's second claim for relief only alleges negligence on the basis that withdrawals were made from the account of SCM absent authorized signatures. The trustee's allegation that the bank negligently opened SCM's account is also without merit as is the trustee's allegation of negligence concerning the manner in which Century honored and returned the drafts which were initially treated as checks.

Accordingly, and for the reasons stated herein, IT IS ORDERED that the Complaint of Spears Carpet Mills, Inc., through its Chapter 7 trustee against Century National Bank of New Orleans, Robert Masson, G & A Carpet Mills, Inc., Dale Black

and Gilbert Federbush, be and is hereby and in all things DISMISSED.

JUDGMENT MAY BE ENTERED AC-CORDINGLY.